**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDWARD LEA and DIOS ASSET MANAGEMENT PTE. LTD., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TAL EDUCATION GROUP, BANGXIN ZHANG, YUNFENG BAI, and RONG LUO,<br><br>Defendants. | Master File No. 1:18-cv-05480-RWS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .......... 1

II. JURISDICTION AND VENUE .......... 4

III. PARTIES .......... 5

IV. SUBSTANTIVE ALLEGATIONS .......... 7

A. The GZ 1-1 Fraud .......... 7

1. Overview .......... 7

2. Background And Chronology .......... 8

3. TAL Never Transferred GZ 1-1 To Changing Edu .......... 9

4. Websites And Ads Still Showed GZ 1-1 As Part Of TAL .......... 10

5. TAL Was Still Paying, And Remained The Lessee, For GZ 1-1's Learning Centers .......... 12

6. Interviews With Former Employees Of GZ 1-1 And Changing Edu Confirm That TAL Never Transferred GZ 1-1 To Changing Edu .......... 13

7. TAL Did Not Transfer Any Deferred Revenue To Changing Edu When It Supposedly Sold GZ 1-1 To Changing Edu .......... 15

8. SAIC Financials For TAL's VIEs In China Show No Evidence Of Transfer .......... 15

9. TAL Controlled Shujia, The Changing Edu Subsidiary That Supposedly Held GZ 1-1 .......... 17

10. Shujia's 2015 And 2016 SAIC Financials Did Not Include GZ 1-1's Business .......... 19

11. It Is Implausible That TAL Disposed Of GZ 1-1 For $50 Million, And Then Re-acquired It For The Exact Same Price Merely Because Changing Edu No Longer Wanted It .......... 20

B. The Shunshun Fraud .......... 21

1. Overview .......... 21

2. Du Zhang Founds Shunshun's Predecessor .......... 22

3. Shunshun Flounders ... 23

4. The June 2015 Purchase ... 24

5. TAL Controlled Shunshun Following The June 2015 Purchase ... 26

6. TAL Acquires Title To 36% Of Shunshun's Shares From A Strawman Owned By Yang Zhang's Wife ... 28

7. Shunshun Failed To Disclose That The June 2016 Purchase Was A Related Party Transaction ... 33

8. Defendants Fraudulently Overstated Shunshun's Deferred Revenues ... 34

V. SUMMARY OF IMPACT OF DEFENDANTS' FALSE STATEMENTS ON TAL'S FY 2016 AND FY 2017 FINANCIAL RESULTS ... 38

VI. DEFENDANTS KNOWINGLY AND/OR SEVERELY RECKLESSLY MADE FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD REGARDING THE FINANCIAL RESULTS OF TAL ... 39

A. Defendants' False And Misleading Statements Disseminated To The Market On May 31, 2016 ... 39

B. Defendants' False And Misleading Statements Disseminated To The Market On June 28, 2017 ... 43

C. Defendants' False And Misleading Statements Disseminated To The Market On June 26, 2018 ... 46

VI. LOSS CAUSATION ... 48

VII. ADDITIONAL SCIENTER ALLEGATIONS ... 48

VII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE- MARKET DOCTRINE) ... 49

VIII. NO SAFE HARBOR ... 52

IX. CLAIMS FOR RELIEF ... 52

X. PRAYER FOR RELIEF ... 57

XI. JURY TRIAL DEMANDED ... 57

# GLOSSARY

**Aizhikang / Zhikang** –the brand names under which GZ 1-1 was known.

**Appliter** – the company that eventually became Shunshun.

**Bai Yunfeng –** President of TAL.

**Bangxin Zhang** – Chairman and CEO of TAL.

**Beixi Wang** – Yang Zhang's wife who established Minqing.

**Changing Edu** – a Chinese education company that specializes in matching K-12 students with teachers who make home visits to conduct one-on-one tutoring. TAL claims that it sold GZ 1-1 to Changing Edu in August 2015.

**DFRL –** one of TAL's VIEs. TAL transferred DFRL to Shunshun for no consideration.

**Du Zhang** - the founder of Appliter, which eventually became Shunshun.

**Feng Li** – fund manager formerly associated with IDG. Became an owner of Shunshun when Li left IDG in May 2015.

**Guangzhou One-on-One ("GZ 1-1")** – TAL's one-on-one tutoring business, based in Guangzhou, that TAL supposedly transferred to Changing Edu in August of 2015.

**Guangzhou Xueersi** – TAL's VIE that held the GZ 1-1 business.

**Hu Guozi** – Changing Edu's co-founder.

**IDG Capital** – a venture capital firm that invested into Shunshun and Changing Edu. Prior to May 2015, IDG controlled Shunshun. In May 2015, IDG transferred Shunshun to Li Feng.

**Lin Xiansuo –** a former teacher who worked for TAL. TAL placed Lin at Shujia as TAL's proxy during the period that GZ 1-1 was supposedly sold to Changing Edu.

**Minqing** - a strawman company established by Beixi Wang for the sole purpose of transferring 36% of Shunshun's shares to TAL. Full name: Fuxhou Minqing Forest Park Business Center Limited Partnership.

**Rong Luo –** CFO of TAL.

**SAIC –** State Administration for Industry and Finance, China's powerful regulatory agency in charge of market supervision and regulation.

**Shujia –** Changing Edu's subsidiary that supposedly held GZ 1-1's business after TAL's purported transfer of GZ 1-1 to Changing Edu. Full name: Guangzhou Shujia Education Technology Co. Ltd.

**Shunshun** – a failed start-up that TAL secretly controlled, and used as a puppet company to engineer illegal accounting profits. Full name: Beijing Shunshun Bida Information Consulting Co. Ltd.

**VIE –** a Variety Interest Entity. Because of China's prohibitions on foreign ownership of companies in certain industries, foreign companies use the VIE structure to circumvent those prohibitions. Under a VIE structure, the foreign holding company controls and operating subsidiary through a series of contracts, rather than equity interest.

**Yang Zhang –** Shunshun's CEO, selected and placed at Shunshun by TAL.

**Ying Liang –** Shunshun's Operations Director who attended the September 25, 2015 training session given by TAL in Wuhan.

**Yuqi Liu** - Shunshun's Technical Director who attended the September 25, 2015 training session given by TAL in Wuhan.

Lead Plaintiffs Edward Lea and Dios Asset Management PTE. LTD. ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by TAL Education Group ("TAL" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of regulatory filings made by TAL, certain of its subsidiaries and affiliates, and certain related parties with the Chinese State Administration for Industry and Commerce ("SAIC"); (c) review and analysis of press releases and media reports issued by and disseminated by TAL; and (d) review of other publicly available information concerning TAL.

## I. PRELIMINARY STATEMENT

1. This is a securities class action brought on behalf of all persons who purchased or otherwise acquired American Depositary Shares ("ADSs")[1] of TAL between June 1, 2016 and June 13, 2018 (the "Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. TAL is a conglomerate that provides services related to education in China through various subsidiaries and affiliates, including variable interest entities ("VIEs") over which TAL exercises control.[2] TAL's services include providing K-12 afterschool and online

[1] American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

[2] A VIE is an entity in which an investor holds a controlling interest that is not based on a majority of voting rights. In such a structure, the investor typically exercises control through contractual arrangements with the owners of the VIE, rather than through ownership of shares of the VIE.

TAL, like a number of other Chinese companies, uses VIEs to get around certain Chinese laws that prohibit foreigners from owning businesses in certain industries. The VIE contract structure gives foreign investors *de facto* control over business entities that are technically owned by Chinese citizens. It is unsettled as to whether a Chinese court would enforce the VIE contractual arrangement. Thus, foreign investors are at the mercy of Chinese nationals

tutoring and assisting students in securing admission and visas to study outside China. TAL has grown largely through acquisitions and now operates in cities throughout China.

3. The educational services industry in China has become increasingly competitive and is now dominated by large companies, many of which are publicly traded in the U.S., like TAL and its competitor New Oriental Education & Technology Group, Inc. TAL's competitors' economies of scale and access to cheap capital have narrowed TAL's margins in China.

4. Defendants were desperate to show that TAL could sustain its margins in the face of mounting competitive pressures. But, unable to do so, they resorted to accounting shenanigans, or, in other words, securities fraud.

5. In August 2015, TAL claimed it had sold one of its tutoring businesses, Guangzhou One-on-One ("GZ 1-1") in exchange for $50 million of preferred shares in the buyer, Changing Education ("Changing Edu"). Based on the sale, TAL recognized $50 million of pre-tax income in its fiscal year ended February 29, 2016 (*i.e.*, FY 2016), about half of its pre-tax income that year.

6. As Defendants tell it, Changing Edu quickly changed directions and lost interest in GZ 1-1. So in November 2016, TAL purportedly bought GZ 1-1 back from Changing Edu, in exchange for cancelling the $50 million preferred Changing Edu shares it had received.

7. The two transactions were entirely fictitious. In fact, during the entire period when Changing Edu purportedly owned GZ 1-1, TAL continued to run the business – hiring teachers and administrators, paying employees' paychecks, and paying GZ 1-1's various leases. GZ 1-1 continued to hold itself out to the Chinese public as a subsidiary of TAL. TAL's sole purpose in the scheme was to generate a false $50 million accounting profit without causing any impact in the real world. Changing Edu went along with the scheme because TAL was a large

---

who legally own and control the Chinese operating entities. TAL has discussed certain risks related to this corporate structure in its SEC filings.

shareholder of Changing Edu.

8. But the GZ 1-1 "sale" and "repurchase" was not the only fraudulent set of transactions TAL announced to goose its earnings. In the summer of 2015, TAL made an $18 million investment into a failed startup, Beijing Shunshun Bida Information Consulting Co. Ltd. ("Shunshun"). Unbeknownst to TAL's investors, and contrary to its public representations, TAL did not merely invest in Shunshun; it actually controlled Shunshun from the date of the investment. TAL selected Shunshun's CEO, who then boasted to Chinese media that TAL treated Shunshun like one of its own business units. And indeed, TAL directed Shunshun's operations. TAL summoned Shunshun executives more than 650 miles from their offices to have TAL CEO Bangxin Zhang deliver them a two-and-a-half-hour training presentation.

9. TAL's control of Shunshun made it, in accounting terms, a VIE. As a result, TAL was required to consolidate Shunshun's financial statements into its own. As detailed *infra*, TAL's failure to consolidate Shunshun's financial statements into its own, by itself, overstated its FY 2016 net income by at least $5.5 million.

10. TAL's plan came to fruition when, in May-June 2016, TAL bought an additional 36% interest in Shunshun. TAL paid a higher price per share in 2016 than it had paid in 2015. Based on this higher price, TAL claimed that Shunshun had increased in value in the intervening year. Accounting rules specifically prohibit companies from recognizing profits from increases in the value of their consolidated VIEs. Yet TAL nonetheless improperly recognized a $25.2 million paper profit from the purported increase in Shunshun's value – thereby dramatically boosting TAL's 2017 earnings.

11. Defendants also overstated Shunshun's deferred revenues. Deferred revenues are payments that have been collected for services that have not yet been rendered. Deferred revenues should be recognized as revenue when the services are actually provided. But by

overstating pre-acquisition deferred revenues, TAL created a piggybank of "revenues" it could recognize to increase its margins whenever margins looked poor. Because these revenues were entirely fictitious, the services did not cost anything to provide; the "revenues" were, instead, pure profits for TAL.

12. On June 13, 2018, short-selling analyst firm Muddy Waters Capital, who has exposed a number of fraudulent Chinese companies, published an exposé (the "Muddy Waters Report") that revealed that TAL had used both the GZ 1-1 and Shunshun transactions to record false accounting profits. That day, TAL's share price fell $4.54/share, or approximately 9.95%, to close at $41.11/share, on heavy volume.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of TAL's ADSs, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

17. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and

the facilities of a national securities exchange.

## III. PARTIES

18. Lead Plaintiffs Edward Lea and Dios Asset Management PTE. LTD., as set forth in their certifications which were previously filed and are incorporated by reference, purchased TAL ADSs during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant TAL is incorporated in the Cayman Islands and its principal executive offices are in Beijing, China. TAL's ADSs trade on the New York Stock Exchange ("NYSE") under the symbol "TAL."

20. Defendant Bangxin Zhang is one of the founders of TAL and has served as the Chairman of its Board of Directors and Chief Executive Officer since TAL's inception. Mr. Zhang received his bachelor's degree in Life Sciences from Sichuan University in 2001, was in the postgraduate program of the Life Science School of Peking University from 2002 to 2007, and received an EMBA degree from China Europe International Business School in 2009.

21. Defendant Yunfeng Bai has served as the President of TAL since October 2016. Prior to that, he served as Senior Vice President of TAL from April 2011 to September 2016. Mr. Bai was in charge of certain new business from February 2016 to October 2016 and was in charge of TAL's Xueersi small-class tutoring business from May 2011 to December 2016. From June 2008 to April 2011, Mr. Bai oversaw TAL's personalized premium services. Mr. Bai founded TAL's high school division in 2005 and was the director of its Beijing operations from June 2006 through May 2008. Mr. Bai received his bachelor's degree in Engineering Automation from Beijing University of Aeronautics and Astronautics in 2003, attended the CEO class of Guanghua Management School of Peking University between 2008 and 2009 and graduated from the EMBA program of China Europe International Business School in 2012.

22. Defendant Rong Luo has served as the Chief Financial Officer of TAL since November of 2014. He also has been in charge of TAL's international education business since December 2016. Mr. Luo was in charge of TAL's strategic investments from February 2015 to December 2016. Mr. Luo also has served as an independent director of the Jiangsu Phoenix Pressing Media Co., Ltd, a PRC media group listed on Shanghai Stock Exchange since March 2016. Prior to joining TAL, Mr. Luo was the chief financial officer of eLong Inc from 2013 to 2014. Before that, Mr. Luo was finance senior manager (China) for the Lenovo Group. Prior to Lenovo, Mr. Luo held a number of positions in Beijing and Seattle in the finance function of the Microsoft Corporation, including analyst, manager and senior manager. Mr. Luo holds a double major bachelor's degree in economics and information management & systems from Peking University and a master's degree in management science and engineering from Tsinghua University.

23. Defendants Bangxin Zhang, Yunfeng Bai, and Rong Luo (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of TAL's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV. SUBSTANTIVE ALLEGATIONS

### A. The GZ 1-1 Fraud

#### 1. Overview

24. One of TAL's core businesses is its Guangzhou one-on-one tutoring business, GZ 1-1, which operates under the brand names Zhikang and Aizhikang.[3] The GZ 1-1 business is held by TAL affiliate Guangzhou Xueersi Education Technology Co. Ltd. ("Guangzhou Xueersi"). Guangzhou Xueersi is a subsidiary of one of TAL's VIEs.[4]

25. In August 2015, TAL purportedly transferred its GZ 1-1 business to a third party, Changing Edu.[5] TAL purportedly received $50 million in Changing Edu redeemable preferred shares as consideration for the transfer.

26. In November 2016, TAL purportedly re-acquired GZ 1-1 from Changing Edu. In exchange, Changing Edu cancelled the $50 million in redeemable preferred shares.

27. In truth, TAL never transferred GZ 1-1 to Changing Edu. TAL simply invented this fake transaction so that it could improperly recognize a $50 million pre-tax gain from the purported sale of GZ 1-1 to Changing Edu. The $50 million pre-tax gain represented 79% of TAL's net income for Q2 2016, and 48.6% of TAL's net income for FY 2016.

28. Changing Edu agreed to participate in this scheme because TAL was a significant shareholder in Changing Edu. At the time of TAL's bogus transfer of GZ 1-1 to Changing Edu, TAL had invested $36.3 million in Changing Edu, accounting for 28% of the $130 million in total funds that Changing Edu had raised in its Series A, B, B+, and C rounds.

---

[3] In TAL's SEC filings, TAL sometimes refers to GZ 1-1 as "Guangzhou Tutoring" or "Guangzhou after-school one-on-one tutoring."

[4] In its Forms 20-F for FY 2016 and FY 2017, TAL lists Guangzhou Xueersi as one of its "VIEs' major subsidiaries and schools." *See* TAL FY 2016 20-F at F-11, TAL FY 2017 20-F at F-11. It its Form 20-F for FY 2018, TAL lists Guangzhou Xueersi as one of its "Affiliated Entities." *See* TAL FY 2018 20-F at Ex. 8.1.

According to the SAIC filings of Guangzhou Xueersi, the specific TAL VIE that owns it is Beijing Xueersi Network Technology Co., Ltd. ("Xueersi Network"). Xueersi Network is listed as one of TAL's VIEs in each of TAL's Forms 20-F for FY 2016, FY 2017 and FY 2018.

[5] *See* TAL FY 2016 20-F at F-66.

### 2. Background And Chronology

29. Changing Edu was established in October 2014 and specializes in matching K-12 students with teachers who make home visits to conduct one-on-one tutoring.

30. Starting February 2015, Changing Edu conducted several rounds of fundraising.[6]

31. In April 2015, TAL made its first investment into Changing Edu, investing $6.3 million into Changing Edu as part of Changing Edu's Series B+ financing.[7]

32. In August 2015, TAL invested an additional $30 million in cash into Changing Edu, as part of Changing Edu's Series C financing.[8]

33. By that time, Changing Edu had conducted four rounds of venture funding: Series A, B, B+, and C. TAL was one of four investors who invested in Changing Edu's venture funding rounds; the other three were IDG Capital, Sequoia Capital, and Trustbridge Partners.[9]

34. Following the conclusion of Changing Edu's Series C round in August 2015, Changing Edu had raised approximately $130 million. TAL's investment accounted for $36.3 million, or 28%, of the total $130 million that Changing Edu raised.

35. TAL, therefore, was a major and important investor in Changing Edu.

36. In conjunction with TAL's $30 million investment in Changing Edu's August 2015 Series C round, TAL also purportedly transferred its GZ 1-1 business to Changing Edu in exchange for $50 million in Changing Edu redeemable preferred shares.[10]

37. Defendant Luo confirmed during the Q2 2016 earnings call on October 22, 2015 that TAL transferred GZ 1-1 for equity in Changing Edu and recorded a gain of $50 million from

---

[6] https://www.changingedu.com/about (last accessed: December 27, 2018).

[7] FY2016 20-F at F-66.

[8] *Id.*

[9] https://www.changingedu.com/about (last accessed: December 27, 2018).

[10] *See* TAL FY 2016 20-F at F-66: "In August 2015, [TAL] purchased [Changing Edu] Series C redeemable preferred shares at the price of $1.6922 per share. … In exchange for this equity interest, the Group paid consideration which consisted of $30,000,000 in cash and the transfer of the Group's Guangzhou after-school one-on-one tutoring business component."

the transfer.

38. In November 2016, barely a year later after it supposedly transferred GZ 1-1 to Changing Edu, TAL purportedly re-acquired GZ 1-1. As consideration, Changing Edu canceled the $50 million in redeemable shares that it previously issued to TAL.[11]

39. TAL's FY 2017 20-F indicated that Changing Edu wanted to dispose of GZ 1-1 because it "no longer fits well with [Changing Edu]'s overall business strategy."

40. Defendants gave no reasons why TAL agreed to buy back GZ 1-1 from Changing Edu, or why the supposed re-acquisition was for the exact same price as the price at which Changing Edu supposedly originally acquired GZ 1-1.

41. The bogus GZ 1-1 transaction had a significant impact on - and greatly improved - TAL's financials for the relevant fiscal periods.

42. For the three months ended August 31, 2015 ("Q2 2016") and full year ended February 29, 2016, TAL recorded a pre-tax $50 million "gain from disposal of a component" from the supposed transfer of GZ 1-1 to Changing Edu,[12] resulting in a an increase in net income of $37.5 million.

### 3. TAL Never Transferred GZ 1-1 To Changing Edu

43. Under U.S. Generally Accepted Accounting Principles ("GAAP"), a transfer of a VIE or part of a VIE is not a bona fide transfer unless the transferor (*i.e.*, TAL) relinquishes all control of the transferee's (*i.e.*, GZ 1-1's) business ***and*** transfers all the assets necessary to operate the business.[13]

44. In the case of TAL's purported transfer of GZ 1-1 to Changing Edu, if TAL continued to (a) control GZ 1-1's business, or (b) did not transfer all the assets needed to operate

[11] TAL FY 2017 20-F at F-49.

[12] TAL Q2 2016 Form 6-K, filed on October 23, 2015.

[13] ASC 810-10-25-38F.

GZ 1-1's business, then GZ 1-1 remained a part of a VIE controlled by TAL that was required to be consolidated with TAL, and TAL may not book a gain on such purported sale.

45. GZ 1-1 is a tutoring business. Its primary business is to employ teachers to teach students in classrooms. Thus, evidence that even after the purported disposition in August 2015, TAL continued to made hiring decisions and paid the teachers, and retained and paid the leases, would show that TAL did not relinquish control of GZ 1-1 or transfer the assets needed to operate its business.

46. Muddy Waters detailed, and Plaintiffs independently confirmed, numerous indicators showing that TAL retained control over GZ 1-1 during the period that GZ 1-1 was supposed to have been sold to Changing Edu. In other words, the purported transfer of GZ 1-1 to Changing Edu was a sham and TAL improperly booked accounting gains in connection with this bogus transaction.

#### 4. Websites And Ads Still Showed GZ 1-1 As Part Of TAL

47. GZ 1-1 maintains its website at http://gz.jiajiaoban.com.

48. The Internet Archive is a digital archive of the World Wide Web,[14] and permits users to view snapshots of websites as they appeared on particular dates in the past.

49. Using the Internet Archive, Plaintiffs viewed GZ 1-1's website as it appeared on September 27, 2015, one month after TAL purportedly transferred GZ 1-1 to Changing Edu. In the "About Us" section, GZ 1-1 described itself as operating under TAL. The "About Us" section also featured several paragraphs describing TAL, including a picture of TAL's IPO on the NYSE. There was no reference to Changing Edu or to any change in ownership.

50. This wasn't merely a case of Changing Edu not having gotten around to updating GZ 1-1's website. Plaintiffs also viewed, through the Internet Archive, GZ 1-1's website as it

[14] Available at https://archive.org/web/.

appeared on August 30, 2016, one year after TAL purportedly transferred GZ 1-1 to Changing Edu. The picture of TAL's IPO was still prominently featured in the "About Us" section, and there was still no mention of Changing Edu.

51. GZ 1-1's website also includes ads for recruiting teachers and administrative personnel. In the August 30, 2016 version of GZ 1-1's website, there was an ad for a "classroom administrator" and interested applicants were directed to send their resumes and inquiries to gzzk_hr@100tal.com, which is an email address associated with TAL.

52. In the August 30, 2016 version of GZ 1-1's website, there was also an ad recruiting tutors. The tutors were directed to send their inquiries to zhaopingzzk@100tal.com, which is an email address associated with TAL. There was also a link to submit an online application, and the top of the online application prominently stated "TAL."

53. The TAL email address, zhaopingzzk@100tal.com, was listed as contact person for several GZ 1-1 job postings in early 2016, when GZ 1-1 was supposed to have been under the ownership of Changing Edu:

a. GZ 1-1 job posting at the Sun Yat Sen University School of Pharmaceutical Sciences, dated May 18, 2016.[15] This ad posting contained a description of GZ 1-1, and the description actually stated that GZ 1-1 was part of TAL.

b. GZ 1-1 job posting at the Sun Yat Sen University School of Foreign Languages, dated May 18, 2016.[16] Similarly, this ad posting contained a description of GZ 1-1, stating that GZ 1-1 was part of TAL.

c. Yingjiesheng (job post aggregator for college students), dated March 29, 2016.[17] Like the previous two postings, this job posting also described GZ 1-1 as part of

[15] http://sps.sysu.edu.cn/article/8076 (last accessed: December 18, 2018).

[16] http://fls.sysu.edu.cn/node/881 (last accessed: December 18, 2018).

[17] http://www.yingjiesheng.com/job-002-251-239.html (last accessed: December 18, 2018).

TAL.

d. South China Normal University, dated May 25, 2016.[18] This posting described GZ 1-1 as part of TAL.

54. Another TAL email address, xizhouzhou@100tal.com, appeared on a GZ 1-1 job posting for interns, dated September 18, 2016.[19] The name TAL appeared in the title of the job posting.

55. Indeed, one year after TAL supposedly disposed of GZ 1-1, it was still controlling the recruitment and hiring of teachers and administrators for GZ 1-1. This is strong evidence that TAL never disposed of GZ 1-1.

### 5. TAL Was Still Paying, And Remained The Lessee, For GZ 1-1's Learning Centers

56. During the Q3 2016 earnings call, which took place on January 27, 2016, Defendant Luo stated that all 10 of GZ 1-1's learning centers had been transferred to Changing Edu. In the presentation slides accompanying the Q3 2016 earnings call, TAL indicated that it had no more One-on-One centers in Guangzhou (down from 10 such centers in the previous quarter).

57. However, Muddy Waters found, and Plaintiffs independently confirmed, that TAL was still paying the rent for – and remained the lessee of – GZ 1-1's learning centers.

58. For example, according to GZ 1-1's website, GZ 1-1 operated a learning center on the third floor of the Tianhe Huayi building, located at 6 West Zhongshan Avenue in the Tianhe District of Guangzhou. According to GZ 1-1's website, this location has been a GZ 1-1 learning center since 2011.

59. Muddy Waters and Plaintiffs obtained records of a lawsuit filed in the Guangzhou

[18] http://career.scnu.edu.cn/thinkcareer/index.php/schoolrecruitment/details/id/1102 (last accessed: December 18, 2018).

[19] http://www.yingjiesheng.com/job-002-348-801.html (last accessed: December 18, 2018).

Intermediate People's Court.[20] The lawsuit concerns the third and fourth floors of the Tianhe Huayi building, where one of GZ 1-1's learning centers is located. According to the lawsuit, in April 2016, when the learning center was supposed to have long been transferred to Changing Edu, TAL subsidiary Tianhe Xueersi paid rent in the amount of RMB 6.2 million (*i.e.*, approximately $0.9 million USD) for the April 1, 2016 to March 31, 2017 lease term.

60. That TAL was still paying the rent for at least one of GZ 1-1's learning centers after it had purportedly transferred GZ 1-1 (and all of its learning centers) to Changing Edu shows that TAL in fact never sold GZ 1-1. Indeed, if TAL had transferred GZ 1-1 to Changing Edu and was paying rent on behalf of Changing Edu, then TAL would have been required to disclose the rent payments as a related-party transaction (since TAL was a significant investor in Changing Edu).[21] TAL's SEC filings contained no such related party disclosure.

**6. Interviews With Former Employees Of GZ 1-1 And Changing Edu Confirm That TAL Never Transferred GZ 1-1 To Changing Edu**

61. Muddy Waters and Plaintiffs' investigator interviewed a number of former employees of TAL, GZ 1-1, and Changing Edu. These former employees either denied that GZ 1-1's ownership had changed hands or did not know of the purported transfer.

62. According to the Muddy Waters Report, Muddy Waters interviewed a number of former Changing Edu managers who provided details about the bogus transaction of GZ 1-1 to Changing Edu. According to the Muddy Waters Report, Changing Edu had established a wholly-owned subsidiary called Guangzhou Shujia Education Technology Co. Ltd. ("Shujia"). Shujia was the Changing Edu subsidiary that was supposed to hold the GZ 1-1 business. In order to create an illusion that an actual business transfer did take place, TAL assigned to Shujia a

[20] This lawsuit is identified as: (2017) YUE 01 Minzhong No. 18443-1, Civil Resolution of the Guangzhou Intermediate People's Court, Guangdong Province.

[21] TAL would be a related party to Changing Edu because TAL is a principal owner of Changing EDU. ASC 850-10-20.

small number of back office staff contracts.

63. According to the Muddy Waters Report, one former Changing Edu manager told Muddy Waters that TAL's contracts with GZ 1-1's students, teachers, and landlords were not transferred to Shujia.

64. Plaintiffs confirmed that Changing Edu did indeed establish Shujia in April 2015. Changing Edu's co-founder, Hu Guozi, was the original Executive Director and Legal Representative of Shujia.

65. According to the Muddy Waters Report, Muddy Waters conducted additional interviews with former TAL and GZ 1-1 employees who confirmed that no transfer took place. According to the Muddy Waters Report, these former employees included:

a. A teacher who worked for GZ 1-1 from 2014 to 2016 and who was still paid by TAL during this entire period.

b. A teacher who worked for GZ 1-1 in 2016, whose contract was signed with TAL, and who said GZ 1-1 had always been part of TAL.

c. A former GZ 1-1 Head of School from 2012 to 2016, who told Muddy Waters that GZ 1-1 was never purchased by Changing Edu and that the relationship between GZ 1-1 and Changing Edu was just some type of cooperation.

66. Plaintiffs' investigator conducted additional interviews with former GZ 1-1 employees, who confirmed Muddy Waters' findings. These included a former GZ 1-1 teacher who taught math for GZ 1-1 in Guangzhou from February 2016 to June 2017 ("Confidential Witness #1" or "CW1"). CW1 stated that CW1's salary was paid by Guangzhou Xueersi during this entire period. As discussed *supra* at ¶24, Guangzhou Xueersi is an affiliate of TAL and a subsidiary of one of TAL's VIEs. Plaintiffs' investigator also interviewed a former Course Manager who worked at GZ 1-1's learning center in Guangzhou's Tianhe District from 2012 to

2018 ("Confidential Witness #2" or "CW2"). CW2 was responsible for arranging courses for students up to 12 years old at GZ 1-1's learning center located at the Tianhe Huayi building. CW2 stated that CW2 never heard of Changing Edu.

**7. TAL Did Not Transfer Any Deferred Revenue To Changing Edu When It Supposedly Sold GZ 1-1 To Changing Edu**

67. For its tutoring services, including the one-one-one tutoring services provided by GZ 1-1, TAL collects tuition from students in advance. The tuition collected in advance is recorded initially as deferred revenue. The deferred revenue is then recognized as revenue when the services (*i.e.*, tutoring) are delivered.

68. If TAL transferred GZ 1-1 to Changing Edu, then TAL needed to transfer the deferred revenue that it collected for GZ 1-1's services to Changing Edu. Not transferring GZ 1-1's deferred revenue to Changing Edu would mean that TAL retained the obligation to provide the pre-paid tutoring services to GZ 1-1 customers. Since providing such services is the core aspect of GZ 1-1's business, this would further indicate that control of the business had not been transferred to Changing Edu.

69. Muddy Waters reviewed TAL's FY 2016 balance sheet and cash flow statement, and saw no changes to the deferred revenue account. Through their independent review of TAL's FY 2016 financials, Plaintiffs independently confirmed Muddy Water's conclusion that there was no evidence of any transfer of deferred revenue to Changing Edu.

**8. SAIC Financials For TAL's VIEs In China Show No Evidence Of Transfer**

70. During TAL's Q4 2016 earnings call on April 28, 2016, Defendant Luo said that TAL accrued a $12.5 million tax liability in China as a result of the purported disposal of GZ 1-1 to Changing Edu.

71. The SAIC is China's powerful regulatory agency in charge of market supervision

and regulation. All PRC companies are required to, among other things, register with the SAIC, file annual financial reports, as well as report all changes in shareholding. In other words, the SAIC's responsibilities roughly mimic those of the SEC and the secretaries/departments of corporations of individual states in the U.S. The SAIC also has a law enforcement role in regulating businesses and penalizing them for non-compliance.

72. The figures reported by TAL's subsidiaries and other Chinese firms in their AIC filings are required to be accurate,[22] as companies are subject to serious penalties for making false statements in their AIC filings, including fines and revocation of the entity's business license.[23] Without a business license the entity cannot legally conduct business in the PRC. If an entity's business license is revoked, the People's Bank of China[24] also requires that the bank account of that entity be closed.[25] Indeed, reflecting their importance, AIC filings must be signed by the legal representative of the entity submitting it. The legal representative must state "I confirm that the content of the submitted company's annual inspection report is true."

73. According to the Muddy Waters Report, Muddy Waters reviewed the SAIC financials of Guangzhou Xueersi, the subsidiary of the TAL VIE that held GZ 1-1's business, and found no evidence of this $12.5 million tax liability.

74. Based on Plaintiffs' review of the SAIC filings of Guangzhou Xueersi, it is apparent that Guangzhou Xueersi is the entity that held GZ 1-1 because:

a. The addresses in Guangzhou Xueersi's SAIC files match those of GZ 1-1's learning centers:

i. Guangzhou Xueersi's registered address on its SAIC filings match that of

---

[22] AIC offices are the local branches of the SAIC.

[23] "Measures for the Annual Inspection of Enterprises" issued in February 24, 2006, Article 20. Available at http://www.asianlii.org/cn/legis/cen/laws/mftaioe486/ (last accessed: December 27, 2018).

[24] People's Bank of China in PRC is equivalent to the Federal Reserve in the U.S.

[25] "Measures for the Administration of RMB Bank Settlement Accounts" issued in April 2003 (No. 5 [2003]), Article 49. Available at: http://www.asianlii.org/cn/legis/cen/laws/arfrbsa521/ (last accessed: December 27, 2018).

GZ 1-1's Tianhe District Zhujiang learning center.

ii. Guangzhou Xueersi's SAIC files show a network of branch companies. The registered addresses for 7 of those branch companies match the addresses of 7 of GZ 1-1's 10 learning centers in Guangzhou.[26]

b. According to TAL, its one-on-one tutoring business is held by its VIE companies (rather than by TAL's VIE schools and training centers).[27] Guangzhou Xueersi is the only TAL VIE company in Guangzhou that purports to engage in this type of business.

75. CW1 likewise stated that CW1's salary was paid by Guangzhou Xueersi, confirming Muddy Waters' conclusion that Guangzhou Xueersi was the entity that held the GZ 1-1 business.

76. According to the Muddy Waters Report, Muddy Waters also reviewed the SAIC filings of every other TAL VIE in Guangzhou to look for evidence of this $12.5 million tax liability, and did not see any evidence of any of these entities having the $12.5 million tax accrual. That the SAIC filings of TAL's VIEs (and related subsidiaries) in Guangzhou, including Guangzhou Xueersi, the entity that held the GZ 1-1 business, do not show any evidence of the $12.5 million tax accrual lends further support to conclusion that TAL never disposed of GZ 1-1.

### 9. TAL Controlled Shujia, The Changing Edu Subsidiary That Supposedly Held GZ 1-1

77. As more fully alleged above (¶¶62-64), Changing Edu established Shujia in 2015, and Shujia was the Changing Edu entity that supposedly held the GZ 1-1 business during the time that the company was purportedly held by Changing Edu. However, Muddy Waters found

[26] GZ 1-1 learning center addresses as of August 10, 2015, via the Internet Archive.

[27] TAL FY 2017 20-F at 26-27.

and Plaintiffs confirmed that in 2015 and 2016, when GZ 1-1 was supposedly under Changing Edu (and Shujia)'s ownership, TAL actually controlled Shujia.

78. Shujia's SAIC Annual Reports for 2015 and 2016, which is publicly available online through the Guangzhou AIC's[28] website, shows a TAL email address (gzzk_xb@100tal.com) as Shujia's contact email.

79. TAL also placed one of its senior managers, Lin Xiansuo ("Lin"), at Shujia. Lin likely was serving as TAL's proxy at Shujia. Lin has a long history with TAL. In 2010, TAL introduced Lin as a "Star Teacher" for its one-on-one tutoring services.[29] Shujia's publicly-available SAIC filings show that on January 20, 2016, Lin replaced Hu Guozi as Shujia's Executive Director and Legal Representative. On the same day, Lin received 10% of the equity interest in exchange for RMB 1.

80. Lin remained in his positions at Shujia until November 21, 2017, when he sold his 10% interest back to Shujia for RMB 1, and was replaced as Executive Director and Legal Representative by Liu Changke, Changing Edu's chairman.

81. After leaving Shujia, Lin returned to TAL and became a Brand Manager for TAL's one-on-one tutoring business.[30]

82. It is inexplicable that Shujia would recruit a teacher from TAL and make him Shujia's Executive Director, Legal Representative, and give him a 10% ownership interest. Under Chinese law, a company's legal representative is perhaps its most powerful officer and is responsible for all aspects of a company's business operations in China. For example, the legal representative has the authority to bind the company to all contracts, enter into transactions, and

[28] AIC offices are the local branches of the SAIC.

[29] http://m.jiajiaoban.com/201005/4bf4b5e85f2d1.shtml (last accessed: December 19, 2018).

[30] http://news.juesheng.com/a/48834.html (last accessed: December 19, 2018).

is the person who signs all of the company's regulatory filings.[31] The legal representative is also the person who's name appears on the company's business license. It is inconceivable that Shujia would hire a teacher from TAL and immediately make him the most powerful person at Shujia. Lin's presence at Shujia – and his subsequent return to TAL following TAL's purported re-acquisition of GZ 1-1 – is evidence that TAL controlled Shujia.

**10. Shujia's 2015 And 2016 SAIC Financials Did Not Include GZ 1-1's Business**

83. Shujia was the Changing Edu subsidiary that supposedly held the GZ 1-1 business following the purported transfer of GZ 1-1 to Changing Edu in August 2015. However, according to the Muddy Waters Report, Shujia's SAIC financials for 2015 and 2016 do not show that it was consolidating GZ 1-1's business.

84. First, according to the Muddy Waters Report, Shujia's SAIC filings reported total revenues of RMB 5.75 million in 2015. This does not make sense if Shujia was consolidating GZ 1-1's business. On the Q2 2016 earnings call, Defendant Luo said that GZ 1-1's revenues for the quarter ended August 31, 2015 were approximately $2.47 million USD (or approximately RMB 17 million).[32]

85. It is unlikely that GZ 1-1's revenue somehow dropped 66%, from RMB 17 million for the three months ended August 31, 2015 to RMB 5.75 million for the last four months of 2015 – and this is assuming that all of the RMB 5.75 million revenue that Shujia reported for 2015 came from GZ 1-1. To the extent that Shujia had revenue sources other than GZ 1-1, it is even more implausible that Shujia was consolidating GZ 1-1's business into its financial results.

---

[31] *See*, *e.g.*, https://www.ipopang.com/blog/business-in-china/should-you-be-legal-representative-in-china/ (last accessed: December 27, 2018).

[32] Defendant Luo said that the one-on-one business accounted for 13% of TAL's total $173.3 million for the quarter (i.e. $22.529 million, or 13% of $173.3 million). And GZ 1-1's revenue accounted for 11% of the total revenue from the one-on-one business (*i.e.*, $2.47 million, or 11% of $22.529 million).

86. Second, TAL stated in its FY 2017 20-F that it acquired $9.4 million (or RMB 65 million based on exchange rates at the time) in deferred revenue when it re-acquired GZ 1-1 in November 2016. According to the Muddy Waters Report, however, a credit report on Shujia obtained by Muddy Waters showed that Shujia ended 2016 with a deferred revenue balance of only RMB 31.8 million. This is further indication that Shujia's financials did not include GZ 1-1's business.

### 11. It Is Implausible That TAL Disposed Of GZ 1-1 For $50 Million, And Then Re-acquired It For The Exact Same Price Merely Because Changing Edu No Longer Wanted It

87. GZ 1-1's quarterly revenue for the quarter ended August 31, 2015 was $2.47 million; that figure implies that GZ 1-1's revenue on an annualized basis would be approximately $10 million.

88. TAL supposedly was able to get Changing Edu redeemable shares worth $50 million for GZ 1-1 in August 2015, or five times GZ 1-1's annualized revenues.

89. Yet, a little more than one year later, in November 2016, TAL supposedly re-acquired GZ 1-1 and the only reason given was that Changing Edu believed that GZ 1-1 "no longer fits well with its overall business strategy."[33]

90. If TAL is to be believed, it re-acquired GZ 1-1 simply because Changing Edu no longer wanted it. TAL gave no reasons as to why ***TAL*** wanted to re-acquire the business that it sold just a year ago. More inexplicably, TAL supposedly re-acquired GZ 1-1 for the exact same price that it supposedly sold it.

91. Indeed, if TAL sold GZ 1-1 to Changing Edu because TAL felt that getting $50 million worth of Changing Edu redeemable shares was a good deal, then it does not make sense that it would agree to take back GZ 1-1 a year later for the exact same price (and simply because

[33] TAL FY 2017 20-F at F-49.

Changing Edu no longer wanted it).

92. That TAL purportedly sold and bought back GZ 1-1 for the same price, and for no reason other than that Changing Edu didn't want it anymore, provides further evidence that this was not a real transaction.

**B. The Shunshun Fraud**

**1. Overview**

93. Even as Defendants used the false transfer of GZ 1-1 to fraudulently recognize $37.5 million in net income, they were laying the groundwork for another accounting fraud that would see them recognize $25.2 million in false net income in TAL's 2017 financial statements.

94. In May 2015, Shunshun was a failed startup in its dying days that had been valued at less than $10 million before its failure. TAL unexpectedly brought it back to life when it, through a series of linked transactions, installed a new Shunshun CEO and made an $18 million investment, which included transferring one of TAL's subsidiaries to Shunshun. Though on paper TAL held a mere minority position in Shunshun, TAL in fact controlled Shunshun as if it were a subsidiary, even summoning Shunshun's senior staff 650 miles for a training session. Thus, unbeknownst to investors, Shunshun was a TAL VIE. TAL was required to consolidate Shunshun's financial statements into its own, but did not.

95. Defendants brought their fraudulent plan to fruition when, in June 2016, TAL purchased an additional interest in Shunshun. TAL made sure that it paid more per Shunshun share in 2016 than it had paid in 2015, implying that Shunshun was worth more in 2016 than it had been in 2015. Accounting rules prohibit companies from using a purported increase in the value of their consolidated VIEs' shares as a reason to recognize a profit. Yet TAL nonetheless did so, recognizing a $25.2 million profit from the purported increase in the value of Shunshun shares TAL had bought in 2015.

96. But even if TAL was somehow permitted to account for its investment in Shunshun as a non-controlling interest using the Fair Value Option, fair value measurement standards specifically prohibits companies from setting prices solely with reference to transactions with related parties, because such transactions cannot be assumed to be at arm's length. Here, TAL also concealed from investors the identity of its counterparty in the 2016 transaction. In fact, the counterparty was Shunshun's CEO Yang Zhang, who as the CEO of a TAL VIE was a member of TAL's management, and therefore a related party.

97. Additionally, to determine a fair value of Shunshun's shares, it would have been necessary to market Shunshun to independent potential investors. Here, TAL knew that Shunshun's CEO never sought to market his interest, but instead always intended to sell it directly to TAL so it could recognize an accounting gain. And indeed, the 2016 transaction grossly overvalued Shunshun.

98. Thus, Defendants misled investors about the nature of TAL's investment in Shunshun, used a strawman to conceal that they acquired a controlling interest in Shunshun from its CEO, and concealed to investors Shunshun's valuation, all in order to conceal that they were improperly using the Fair Value Option to record a fake $25.2 million profit.

**2. Du Zhang Founds Shunshun's Predecessor**

99. In the first half of 2014, 19-year old Du Zhang dropped out of college. He also founded Shunshun's predecessor, Appliter, in Hangzhou, his home town.

100. In July 2014, Du Zhang received a $2 million investment from venture capital firm IDG for a minimum of 20% of Appliter's shares, with the remainder owned by Shunshun's founders Du Zhang, Weiqi Zhang, and Yuxiao Liu (the "Shunshun Founders")

101. IDG's investment gave it effective control over Appliter. In December 2014, Du Zhang and IDG incorporated a new company, Shunshun, and transferred Appliter's operations to

it. Shunshun was based in Beijing. In its filings with the SAIC, Shunshun listed an IDG subsidiary's Beijing business address and phone number as its own.

### 3. Shunshun Flounders

102. Shunshun aimed to be a platform to allow prospective overseas students to ask for advice from overseas students and overseas school administrators.

103. According to a China Network article, by October 2014, Du Zhang had definitely concluded that the idea behind Shunshun wouldn't work.[34] As he told Study Abroad Talk, a Chinese Magazine, for an article published on September 16, 2015, overseas students were too busy to dedicate time to answer questions.[35] Du Zhang accordingly pivoted to a completely different business model, providing assistance to independent overseas consultants seeking to start their own businesses.

104. That business failed too. Shunshun's site wasn't even in use by March 1, 2015, and generated only 31k visits per month by June 16, 2015. Further, as set out in Table A below ¶125, in May/June 2015, Shunshun both replaced its CEO and drastically changed investors – hardly the mark of a successful startup.

105. And in fact, from at least that point on, Shunshun sold itself as an overseas education intermediary assisting Chinese students to apply to study abroad. There are hundreds if not thousands of overseas education intermediaries in China.

106. In May 2015, Feng Li, one of the former partners of IDG, and IDG ended their relationship. In connection with the severance, IDG offloaded certain of its investments to Li. One of these investments was Shunshun.

[34] http://edu.china.com.cn/2015-06/02/content_35714874.htm

[35] https://freewechat.com/a/MzAxMzY0Mzg2MA==/649664741/1.

**4. The June 2015 Purchase**

107. In June 2015, Shunshun entered into a three-part transaction between (a) itself and its investors, (b) an individual named Yang Zhang, and (c) TAL (the "June 2015 Purchase"), which led to: (1) placing Yang Zhang at Shunshun's helm, while slashing the Shunshun Founders' interests; (2) an investment by TAL into Shunshun of $18 million in cash and kind; and (3) transfer of Beijing Dongfangrenli Science & Commerce Co., Ltd. ("DFRL"), a VIE controlled by TAL, from TAL to Shunshun, which constituted part or all of the in-kind consideration paid by TAL. Shunshun's capital structure over time is set out at Table A, below. The specific steps which make up the June 2015 Purchase are set out in Exhibit 1 to this Complaint.

108. It is apparent that the transactions that make up the June 2015 Purchase were an integrated whole. By agreeing to the terms of the June 2015 Purchase, the Shunshun Founders implicitly admitted that Shunshun had failed. Prior to the June 2015 Purchase, the Shunshun Founders were Shunshun's only investors other than IDG; after the June 2015 Purchase, they held only 7.0% of Shunshun's shares, of which Du Zhang held 4.2% and Yuxiao Lui 2.8%. Neither IDG nor Yang Zhang invested any money to buy out the Shunshun Founders. The Shunshun Founders would have had no reason to nearly zero out their investment unless Shunshun was receiving an outside investment that made Shunshun potentially viable or there was some money to pay them for their shares.

109. Likewise, Yang Zhang's decision to join Shunshun makes no sense unless it was coupled with a significant cash investment from a third party. According to his public blog, Yang Zhang's wife gave birth in July 2014. In early 2015, Yang Zhang, his wife, and their child were pursuing permanent resident status in Canada. Without significant cash inflows, Shunshun had little hope of becoming a viable company. Further, Shunshun could not operate as an

overseas education intermediary without a license that DFRL held, but Shunshun did not. Yang Zhang would not have agreed to become Shunshun's head when he had substantial personal responsibilities if he knew it would collapse; instead, Yang Zhang only agreed to become Shunshun's head because TAL's investment and DFRL's license would give Shunshun a fresh start.

110. Finally, Shunshun's Founders had run Shunshun nearly into the ground. TAL would have no interest in investing an additional $18 million for them to waste. And Yang Zhang had a long relationship with TAL's officers. According to an interview of Yang Zhang published on July 13, 2015 on Study Abroad Talk (the "July Study Abroad Article"), Yang Zhang met Defendant Bangxin Zhang almost a decade earlier, in 2007. Indeed, between 2007 and TAL's investment in Shunshun, TAL and Yang Zhang had actually discussed having Yang Zhang join TAL to run a study-abroad project.

111. Accordingly, the June 2015 Purchase was a series of integrated transactions. As Yang Zhang put it in the July Study Abroad Article, the transaction was "sort of like a marriage."

112. TAL reported that its investment was for a 30% stake in Shunshun, placing a valuation on Shunshun of $60 million. Yang Zhang told the Study Abroad Talk interviewer for the July Study Abroad Article that TAL's investment gave Shunshun an "extremely high valuation."

113. Defendants had actual knowledge of the June 2015 Purchase's terms. To get around Chinese laws, TAL did not own DFRL outright. Instead, DFRL was a TAL VIE, which TAL controlled through contractual arrangements. DFRL's nominal owners, who had to sign for all important corporate transactions, including DFRL's transfer to Shunshun, were three TAL executives. One of these three executives was Defendant Bangxin Zhang. Moreover, Yang Zhang told the Study Abroad Talk interviewer for the July Study Abroad Article that Defendant

Bangxin Zhang personally negotiated the terms of the June 2015 Purchase with him.

### 5. TAL Controlled Shunshun Following The June 2015 Purchase

114. Accounting rules provide that in some cases, entities that own less than 50% of a subsidiary may nonetheless control it for accounting purposes, rendering them VIEs. ASC 810-10-25-11. As set out in this Section, TAL controlled Shunshun from at least the date of the June 2015 Purchase.

115. The ability to select, terminate, or set the compensation of the investee's key management is sufficient for control. ASC 810-10-25-11.a. As more fully alleged above, TAL selected Yang Zhang as Shunshun's CEO as part of the June 2015 Purchase. Similarly, the largest portion of Yang Zhang's compensation was the value he might realize by selling his Shunshun shares. As more fully alleged below, the purpose of the Shunshun investment was for TAL to purchase Yang Zhang's shares for more than their fair value. TAL thus controlled Yang Zhang's compensation.

116. There are other signs that TAL controlled Shunshun. First, Yang Zhang also told the interviewer for the July Study Abroad Talk Article that Shunshun was "in very close talks with TAL about deep integration, and all of TAL's resources will be open to us," adding that "TAL's top management classifies us just like a business unit." Second, according to DFRL's SAIC filings, a TAL employee, Haiyan Wei, was authorized to submit documents to the SAIC on DFRL's behalf on August 1, 2015, as well as on August 31, 2015, after TAL had transferred DFRL to Shunshun.

117. Third, in public-facing job advertisements, TAL reported that Shunshun operated "under the flag of TAL Group", a common phrase in Chinese indicating that TAL controls Shunshun.[36] Indeed, the advertisements confirm that TAL was asserting control because the

[36] https://xjh.haitou.cc/article/320916.html

other companies it lists as part of the TAL Group are all subsidiaries or VIEs that TAL actually controls.

118. Fourth, TAL provided resources to Shunshun. Beginning immediately after the June 2015 Purchase, TAL shared its client lists – covering 300,000 students – with Shunshun. TAL likewise shared a sublist of overseas clients.

119. Fifth, TAL instructed Shunshun's senior management on how to carry out their obligations. According to a September 25 posting on Yang Zhang's public blog, TAL summoned Shunshun's senior management for a training session held on September 25, 2015, in Wuhan, China – more than 650 miles away from Shunshun's headquarters in Beijing. The training session was delivered by Defendant Bangxing Zhang himself, and lasted two-and-a-half hours. A group attendance picture on Yang Zhang's blog confirms that Yang Zhang attended the training session, along with Du Zhang, Shunshun's Operations Director Ying Liang, Shunshun's Founder and Technical Director Yuqi Liu, and more than twenty other Shunshun employees.

120. Accordingly, TAL controlled Shunshun. Because of this control, TAL had to consolidate Shunshun's financial statements into its own and list it as a VIE. ASC 810-10-05-8A.

121. TAL did not do so. TAL's 20-F for the year ended February 29, 2016 (the "2016 20-F") provides that "in December 2015, we made a minority equity investment of $10.5 million in [Shunshun], which primarily engages in providing professional counseling services to students who desire to study abroad through its online-to-offline platform." In fact, TAL held a controlling interest in Shunshun, which was a TAL VIE. The 2016 20-F stated that TAL "accounted for below [sic] investments [including Shunshun] as debt securities and classified as available for-sale-investments". Because TAL held a controlling interest in Shunshun, it could not account for its investment as an available-for-sale investment, but instead was required to

consolidate its financial results onto its own financial statements.

122. Exhibit 8.1 to TAL's 20-F for the fiscal year ended February 29, 2016 (the "2016 20-F") purported to set out all of TAL's subsidiaries and VIEs, but misleadingly omitted Shunshun. Further, by failing to consolidate Shunshun's net loss into TAL's financial statements, the 2016 20-F misleadingly overstated TAL's net profits. *See* ¶165, *infra*.

### 6. TAL Acquires Title To 36% Of Shunshun's Shares From A Strawman Owned By Yang Zhang's Wife

123. On May 26, 2016, Yang Zhang's wife Beixi Wang established Fuxhou Minqing Forest Park Business Center Limited Partnership ("Minqing"). She held 87.5% of Minqing's shares.

124. Two days later, each of Liu, Du Zhang, and Yang Zhang transferred the majority of their shares to Minqing. Following the transfer, Minqing held 36% of Shunshun's shares.

125. Within two weeks, Minqing sold its 36% interest in Shunshun to TAL (the "June 2016 Purchase"). TAL reported that it paid $32.7 million for the shares, of which $28.6 million was for purchase of Yang Zhang's shares. Its purpose accomplished, Minqing was deregistered on October 10, 2016.[37]

TABLE A – NOMINAL OWNERSHIP OF SHUNSHUN OVER TIME

| | Founders collectively | Yang Zhang | IDG/Feng Li/FreeS Funds[38] | TAL |
|---|---|---|---|---|
| After IDG investment | No more than 80% | 0% | No less than 20% | 0% |
| After Completion of June 2015 Purchase | 7% | 49% | 14% | 30% |

[37] It is unclear whether the full $32.7 million was actually given to Yang Zhang and the two other purported sellers, or whether a portion or all of it was misappropriated by other TAL insiders.

[38] In October 2015, Feng Li founded a new series of investment funds, the FreeS Funds, to seek investments and hold the interest in Shunshun. None of IDG, Feng Li, or the FreeS Funds made any additional investment into Shunshun after IDG's initial summer 2014 investment.

| | | | | |
|---|---|---|---|---|
| After Completion of June 2016 Purchase | 2.5% | 17.5% | 14% | 66% |

126. TAL's SEC filings did not disclose the identity of TAL's counterparty.

127. TAL used the June 2016 Purchase to inflate the value of Shunshun and thereby recognize a false paper profit.

128. In its 2017 20-F, TAL remeasured the value of the 30% interest in Shunshun that it acquired in the June 2015 Purchase using the Fair Value Option accounting method.

129. Companies must record investments in companies over which they hold significant influence using the ***Equity Method***. Companies must ***consolidate*** the financial statements of companies they control into their own.

130. When a company acquires a greater than 20 percent interest in another entity ***which it does not control***, the company generally should account for the interest using the equity method of accounting. The company may also use the Fair Value Option to measure the value of its investment. The company could use market transactions in the other entity's shares as a reference point for its value. The company would also be able to use increases in the interest's value, as measured by these market transactions, as a basis to recognize accounting profits.

131. Defendants used the June 2016 Purchase as the reference transaction to recognize a $25.2 million gain in the value of its initial 30% interest in Shunshun. According to Defendants, the June 2016 Purchase price set out Shunshun's true fair value, justifying TAL in using the Fair Value Option to remeasure TAL's interest in Shunshun. At the reported price, the June 2016 Purchase implicitly valued Shunshun at $90.8 million. At the same time, the June 2016 Purchase gave TAL majority ownership of Shunshun's shares. According to Defendants, the majority ownership made Shunshun's shares more valuable to TAL, entitling it to recognize

a control premium. Thus, Defendants claimed that the fair value of the 30% had increased by $16.7 million, while recognizing an additional control premium of $8.5 million, for a total paper profit of $25.2 million.

132. The facts concealed from investors precluded TAL from using the Fair Value Option to record the $25.2 million profit.

133. Accounting rules flatly prohibit companies from using the Fair Value Option to recognize gains based on the value of interests in entities the company controls and must consolidate, like its VIEs. ASC 825-10-15-5. Indeed, accounting rules more broadly prohibit companies from recognizing any gain or loss on changes in the parent company's ownership interest in the consolidated entity. ASC 810-10-45-23.

134. Here, unbeknownst to investors, TAL controlled Shunshun from the time of the June 2015 Purchase, and was required to account for it by consolidating Shunshun's financial statements into its own. TAL could not use the Fair Value Option to remeasure its investment in Shunshun as a result of the June 2016 Purchase. Thus, by concealing from investors that TAL controlled Shunshun, Defendants concealed that TAL could not use the Fair Value Option.

135. Even if TAL were somehow permitted to account for its investment in Shunshun as a non-controlling interest using the Fair Value Option, TAL concealed that its counterparty was not a third party, but was instead Yang Zhang. The Fair Value Option is an accounting method that may be used instead of the Equity Method allowing a company to carry an investment in a financial instrument at its fair value at a particular date, defined as "[t]he price that would be received to sell [the] asset [] in an ***orderly transaction*** between ***market participants*** at the measurement date." ASC 825-10-20, Definition of Fair Value (emphasis in original). "Market Participants", in turn, is defined to exclude related parties. ASC 825-10-20, Definition of Market Participants, a.

136. Here, TAL used the purchase price from the June 2016 Purchase as a reference transaction to revalue the interest in Shunshun it had acquired in the June 2015 Purchase. Yang Zhang was the CEO of one of TAL's VIEs, and as such, was a member of its management and a related party. ASC 850-10-20, Definition of Management; ASC 825-10-20, Definition of Related Parties, e. (management and their immediate families are related parties). In measuring the fair value of its investment in Shunshun, TAL must recognize that the purchase transaction was between related parties and, therefore, the price paid might not represent the fair value of an asset because of the related party relationship. ASC 820-10-30-3A. Accordingly, TAL was not permitted to use only the purchase price from the June 2016 Purchase as evidence of Shunshun's fair value. It needed other evidence, but never got any, thus precluding the use of the Fair Value Option.

137. Additionally, an "Orderly Transaction" is defined to "assume[] exposure to the market for a period before the measurement date to allow for marketing activities." ASC 850-10-20, Definition of Orderly Transaction. Here, Yang Zhang did not expose his interest to the market to value it. Rather, Defendants' and Yang Zhang's plan was to agree on a price for Yang Zhang's shares that was well above the market rate so that TAL could recognize an accounting profit.

138. Shunshun's valuation in July 2015 when TAL made its initial investment was $60 million – a valuation Shunshun's own CEO called "extremely high".

139. The valuation TAL placed on Shunshun nearly ***doubled*** from $60 million in July 2015 to $103 million in June 2016 to $117 million in November 2016.

TABLE B – VALUATION OF SHUNSHUN

| Month | Event | Valuation |
|---|---|---|
| June 2015 | TAL investment | $60 million |
| June 2016 | TAL purchases additional 36% | $90.8 million ($103.7 million with control premium) |
| November 2016 | TAL purchases additional 14% | $116.5 million |

*Source: 2017 20-F*

140. Yet between 2015 and 2016, Shunshun's performance was far from extraordinary. In fact, its net loss nearly doubled to more than $14.2 million, on revenues of a mere $6.2 million, as set forth in Table C below.

TABLE C – KEY FINANCIAL DATA FOR SHUNSUN (2015 - 2017)

| *For the year ended/as of December 31 (in million)* | *2015* | *2016* | *2017* |
|---|---|---|---|
| Equity | $3.4 | ($6.6) | ($28.5) |
| Revenues | $0.3 | $6.2 | $11.8 |
| Net income | ($7.4) | ($14.2) | ($21.8) |

*Source: Shunshun and DFRL SAIC Filings*

141. Thus, Shunshun operated with persistent and substantial deficit.

142. While Shunshun boasted in early 2015 that it had developed revolutionary information technology that would allow prospective students to contact overseas students, it had abandoned its plan prior to the June 2015 Purchase. An employee who worked as a DFRL Counselor between September 2016 and March 2017 ("Confidential Witness #3" or "CW3"), where he assisted students with their applications, stated that Shunshun was just a typical overseas study consulting firm. It had no special intellectual property and no product to

distinguish it from its more successful peers. A Shunshun Senior Document Counselor between October 2015 and August 2017 ("Confidential Witness #4" or "CW4"), whose job was to prepare documents for students' applications, stated that the Shunshun's vaunted technology was simply a basic website function allowing Shunshun's customers to contact their Counselor and to view the status of their applications, services that are also offered by Shunshun's peers. A Shunshun PHP Developer employed between October 2015 and March 2017 ("Confidential Witness #5" or "CW5") stated that neither Shunshun's IT team nor its products were "ground-breaking."

143. Indeed, Shunshun's performance fell short of basic business competence. As set out further below, a significant portion of Shunshun's business consists of earning deferred revenues by pre-selling services to students and converting these deferred revenues into actual recognized revenues by delivering the services to the students it has engaged to provide. Yet Shunshun's financial statements show that it was able to convert at most 68% of its deferred revenues to revenues in a year. This means that as to at least 32% of its customers, Shunshun failed to deliver the services it contracted for within a year – if ever.

**7. Shunshun Failed To Disclose That The June 2016 Purchase Was A Related Party Transaction**

144. GAAP mandates disclosure of related-party transactions, which includes transactions between a company and its management and members of their immediate families. ASC 850-10-05-3 d. "Management" means "[p]ersons who are responsible for achieving the objectives of the entity and who have the authority to establish policies and make decisions by which those objectives are to be pursued." ASC 850-10-20. Yang Zhang had the same authority over and responsibility for Shunshun's performance as TAL's CEO had over the whole TAL Group. He was therefore a member of TAL's management, and his wife, Beixi Wang, as a member of his immediate family, was also a related party. Accordingly, the June 2016 Purchase

was a related-party transaction which had to be disclosed as such in TAL's financial statements, including the 2017 and 2018 20-Fs and the Q1 2017 and 2018 6-Ks, but was not.

145. The failure to disclose that the June 2016 Purchase was a related-party transaction rendered TAL's financial statements materially misleading. Even if senior TAL management did not simply steal the money, a $28.6 million payment to a CEO of a VIE who held the position for one year and did not achieve any important objectives would have suggested to investors that management was looting TAL's assets. Indeed, that Yang Zhang and TAL used a straw purchaser to complete the transaction shows they ***intended*** to materially mislead investors.

**8. Defendants Fraudulently Overstated Shunshun's Deferred Revenues**

146. Defendants also fraudulently overstated the amount of deferred revenues Shunshun[39] has before the June 2016 Purchase.

147. Deferred revenues are advance payments a company has received for services it has not yet delivered. They are recorded as liabilities on financial statements. Then, as the company provides the contracted-for services, it recognizes the deferred revenues, which both decreases the deferred revenue balance and at the same time increases revenues.

148. Because deferred revenues are funds that a company has already collected from its customers, there is no risk that the company will not be able to collect the funds. Rather, if a company fails to convert deferred revenues into revenues, it is because it did not provide the service it agreed to provide and was forced to issue a refund.

149. Defendant Rong Luo acknowledged on TAL's Q3 2017 earnings call, which took place on January 19, 2017, that Shunshun recognizes deferred revenues when students sign their contracts and prepay for the services, and then converts the deferred revenues into revenues when students start their studies abroad, 10-12 months later. On the Q4 2017 earnings call

[39] In this section, references to Shunshun include its wholly-owned subsidiary, DFRL, unless otherwise noted.

taking place on April 27, 2017, Luo repeated that Shunshun converted revenues in "around" 12 months. Luo added that Shunshun typically recognizes deferred revenues during TAL's Q2 and Q3, which is the 6-month period closing on November 30 that includes the start of most countries' academic years.

150. As set out in its and DFRL's SAIC filings, Shushun's total revenues for 2016 and 2017 combined was only $17.8 million, of which it recognized $11.4 million in 2017. TAL reported that Shunshun's deferred revenues as of July 31, 2016 were $24.8 million – or $7.0 million higher than its total revenues for 2016 and 2017 combined.

151. It is implausible that in July 2016, a large number of students had already paid Shunshun to help them start school two years later in the 2018/2019 academic year. Thus, TAL should have recognized Shunshun's deferred revenues as of July 2016 by the beginning of the 2017/2018 academic year ***at the latest***. The deferred revenues as of July 31, 2016 should have been converted to revenues in 2016 and 2017, predominantly in the periods of August 2016 through November 2016 and June 2017 through November 2017. Thus, Shunshun's deferred revenues as of July 31, 2016 should not exceed its revenues for all of 2016 and 2017.

152. In fact, there are two large categories of revenues TAL earned in 2016 and 2017 that would not be included in Shunshun's deferred revenues as of July 31, 2016. The first of these is revenues from students who started their studies at any time before July 31, 2016. Deferred revenues from those students would already have been converted to revenues as of July 31, 2016, and would thus not appear as deferred revenues in Shunshun's financial statements as of that date. This is likely a large group, as TAL reported that it converted the majority of deferred revenues to revenues in Q2 and Q3 of each year. By July 31, 2016, Q2 2016 was already two-thirds over.

153. The second group is revenues from students who hired TAL to help place them

into a class for the 2017/2018 academic year, but did not do so until after July 31, 2016.[40] Given that early application deadlines frequently fall in October through December, it is likely that many if not most students who hope to study abroad will not hire Shunshun until late summer or early fall of the previous year. Luo confirmed as much when he stated that Shunshun typically converted deferred revenues in 10-12 months. Revenues from students who began their studies in the 2017/2018 academic year but hired Shunshun after July 31, 2016 would, likely, not be reflected in deferred revenues, because the student had not even hired and paid Shunshun at that time.

154. For the reasons set forth in ¶¶150-56, *infra*, it is apparent that the reason Shunshun did not convert much of the $24.8 million in deferred revenues into revenues is that much of those deferred revenues never existed in the first place.

155. TAL announced its Q4 2017 results in April 2017, but did not file its 20-F until June 2017.

156. The publicly accessible version of DFRL's 2016 annual financial statements shows that after being filed, the annual financial statements was drastically amended on May 31, 2017.

157. The publicly accessible version of DFRL's 2016 annual financial statements shows the numerical value of the changes but does not show which line item the change corresponds to. Yet it is clear that certain of the changes were drastic.

158. According to the Muddy Waters Report, Muddy Waters obtained credit reports for Shunshun that showed the corresponding entries. Muddy Waters also provided a reconciliation of the credit reports to the SAIC filings. According to the Muddy Waters Report, the May 31, 2017 changes in DFRL's annual report increased DFRL's total assets from $2.3

---

[40] Shunshun's 2017 revenues were nearly double its 2016 revenues.

million to $21.6 million, and its total liabilities from $11.1 million to $30.7 million.

159. According to the Muddy Waters Report, the amendments increased cash, prepaid expenses, and other receivables on the asset side by $19.7 million, while increasing prepayments received on the liabilities side by $19.7 million.

160. "Prepayments received" means deferred revenues. Thus, the May 31, 2017 amendments to Shunshun's liabilities increased Shunshun's deferred revenues by $19.7 million. The changes made to the asset side provide further evidence. Prepayments to Shunshun will increase Shunshun's cash. When Shunshun spends some of the cash to deliver some of the services it agreed to provide, Shunshun will recognize prepaid expenses. Thus, the changes to the asset side further show that the May 31, 2017 amendments increased Shunshun's deferred revenues.

161. In sum, after TAL announced its Q4 2017 financial results but before it filed its 2017 20-F, Defendants caused DFRL to amend its SAIC filings to add $19.7 million in deferred revenues so that they would support the higher numbers TAL reported in the U.S.

162. Further, according to the Muddy Waters Report, DFRL's initial SAIC filings showed RMB15.3 million in total assets, while its amended filings showed RMB15.5 million in cash alone, or more than its total assets. It is easy and simple to test for cash; therefore, it is implausible that DFRL would somehow miss the fact that it had RMB 15.5 million in cash when it filled out its SAIC filings.

163. By overstating deferred revenues, TAL was able to make its operations appear more profitable than they actually were. As it conducts its operations, TAL earns revenues but incurs costs. TAL's margins are poor, meaning that TAL's revenues are not much higher than its costs. Deferred revenues, however, do not arise from services rendered during the reporting period, nor does TAL receive cash for these services during the reported period. Rather, deferred

revenues correspond to cash that has been received in a prior period to pay for services which must be provided in the current period. As a result, by inflating deferred revenues, TAL is able to pretend that the costs it incurs in providing services to earn revenues during the reporting period also earned the revenues from the prior period – thus inflating TAL's operating income and making its operations appear more profitable than they were.

164. These $19.7 million of deferred revenues gave TAL a cookie jar from which it could pull additional revenues to increase its net income in quarters where its performance fell short of expectations.

## V. SUMMARY OF IMPACT OF DEFENDANTS' FALSE STATEMENTS ON TAL'S FY 2016 AND FY 2017 FINANCIAL RESULTS

165. Defendants' false statements concerning the fraudulent GZ 1-1 and Shunshun transactions had the following effects on TAL's financial statements for FY 2016 and FY 2017:

a. Shunshun's 2015 SAIC filings show that it lost $7.5 million in the year ended December 31, 2015. Prior to the June 2015 Purchase, Shunshun had only received an investment of $2 million from IDG. Even assuming that it spent the entire $2 million before TAL's investment, Shunshun must still have lost at least $5.5 million after the June 2015 Purchase. TAL was required to consolidate the loss onto its financial statement for the year ended February 29, 2016, which would have decreased its net income by at least $5.5 million – even if Shunshun had not lost a penny in the first two months of 2016.

b. In TAL's 2016 20-F, Defendants also improperly recognized a gain from the disposition of GZ 1-1. As Defendant Luo explained in TAL's Q4 2016 earnings call, TAL accrued taxes on the disposition at the 25% enterprise rate. Defendants thus fraudulently inflated TAL's net income as reported in the 2016 20-F by another $37.5 million they attributed to the disposition of GZ 1-1.

c. In TAL's 2017 20-F, by improperly applying the Fair Value Option, TAL realized fraudulent profits of $25.2 million.

166. Thus, TAL's 2016 and 2017 20-Fs overstated its net income for the fiscal years by at least the amounts set out below:

| | As originally reported | Overstatement ($) | True amount | Overstatement (%) |
|---|---|---|---|---|
| FY 2016 | $102.8 million | $43.0 million | $59.8 million | 71.9% |
| FY 2017 | $112.5 million | $25.2 million | $87.3 million | 28.9% |

167. In addition, in TAL's 2017 20-F, Defendants included entries breaking down the purchase price of Shunshun and setting out its contribution to TAL's financial statements as of the date of its purported acquisition, namely July 31, 2016. There, Defendants reported that Shunshun's financial statements reported deferred revenues of $24.8 million as of the date of its purported acquisition, thus increasing TAL's deferred revenues by that amount.

168. These entries on TAL's financial statements were materially misleading because TAL overstated the amount of Shunshun's deferred revenues by at least $19.7 million.

## VI. DEFENDANTS KNOWINGLY AND/OR SEVERELY RECKLESSLY MADE FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD REGARDING THE FINANCIAL RESULTS OF TAL

169. Throughout the Class Period, Defendants were aware or severely reckless in not knowing that the financial results of TAL were materially misstated due to the fraudulent transactions involving GZ 1-1 and Shunshun.

### A. Defendants' False And Misleading Statements Disseminated To The Market On May 31, 2016

170. On May 31, 2016, TAL filed with the SEC a materially false and misleading Form 20-F for the fiscal year ended February 29, 2016 (the "2016 20-F"). In the 2016 20-F, TAL reported, for FY 2016, net income of $102,756,200, basic net income per ADS of $1.29 and diluted net income per ADS of $1.21.

171. In the 2016 20-F, TAL also reported a gain from disposal of components of $50,377,126, $50 million of which related to the purported transfer of GZ 1-1 to Changing Edu.

172. The 2016 20-F further stated:

> In August 2015, the Group purchased Series C redeemable preferred shares at the price of $1.6922 per share. In the meantime, several third party investors purchased Series C redeemable preferred shares at the same price. In exchange for this equity interest, the Group paid consideration which consisted of $30,000,000 in cash and the transfer of the Group's Guangzhou after-school one-on-one tutoring business component. A gain of $50,000,000 from the disposal of the Guangzhou one-on-one component was recognized during the year ended February 29, 2016.

173. With respect to Shunshun, the 2016 20-F stated:

> [I]n December 2015, we made a minority equity investment of $10.5 million in [Shunshun], which primarily engages in providing professional counseling services to students who desire to study abroad through its online-to-offline platform.

174. The 2016 20-F further stated:

> [TAL] accounted for [the] below investments [including Shunshun] as debt securities and classified as available-for-sale investments, which were measured subsequently at fair value in the balance sheet and unrealized holding gains and losses shall be reported in other comprehensive income.

175. In addition, Exhibit 8.1 to the 2016 20-F, which provided a list of TAL's subsidiaries and consolidated affiliated entities, failed to list Shunshun as a VIE.

176. The statements in ¶¶170-75 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That TAL's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated. GAAP requires accounting to reflect the substance of a transaction over its legal form;

b. The reported transfer of the GZ 1-1 business was fictitious and lacked economic

substance as TAL never transferred or relinquished control of GZ 1-1 to Changing Edu and continued to make GZ 1-1's hiring decisions, pay its teachers, and retain and pay its leases;

c. $50 million of the $50,377,126 gain should not have been recognized and was in violation of GAAP;

d. Shunshun was controlled by TAL and therefore was a VIE pursuant to ASC 810-10-05-8A whose financial results should have been consolidated with TAL's and TAL invested in June, not December, 2015.

e. TAL failed to consolidate at least $5.5 million in losses from Shunshun that it was required to consolidate under GAAP.

e. As a result of the foregoing, TAL's net income for FY 2016 was overstated by approximately $43.0 million (roughly 71.9%) and its basic net income per ADS and diluted net income per ADS were overstated by the same percentage; and

f. As a result of the foregoing, TAL's financial results and financial statements misrepresented the Company's true financial condition, operations, and prospects.

177. The 2016 20-F was signed by Defendant Zhang. In addition, attached as Exhibits 12.1 and 12.2 to the 2016 20-F were certifications pursuant to Section 302 of the Sarbanes-Oxley Act ("SOX"), 15 U.S.C. §7241 ("SOX 302 Certifications"), signed by Defendants Zhang and Luo, respectively. Attached as Exhibits 13.1 and 13.2 to the 2016 20-F were certifications pursuant to Section 906 of SOX, 18 U.S.C. §1350 ("SOX 906 Certifications"), signed by Defendants Zhang and Luo, respectively.

178. The SOX 302 Certifications stated:

1. I have reviewed this annual report on Form 20-F of TAL Education Group;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

179. The SOX 906 Certifications certified that:

> (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

180. The statements in ¶¶178-79 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth in ¶176. The statements in ¶¶178-79 were further materially false and/or misleading because, as a result of the transactions described above, TAL lacked adequate internal controls over financial reporting and the false certifications accompanying TAL's Annual Reports failed to disclose Defendants' illicit accounting scheme.

### B. Defendants' False And Misleading Statements Disseminated To The Market On June 28, 2017

181. On June 28, 2017, TAL filed with the SEC a materially false and misleading Form 20-F for the fiscal year ended February 28, 2017 (the "2017 20-F"). In the 2017 20-F, TAL reported, for FY 2017, net income of $112,490,000, basic net income per ADS of $1.44 and diluted net income per ADS of $1.32. The 2017 20-F also repeated the FY 2016 financial results described in ¶170.

182. In the 2017 20-F, TAL also reported, in connection with the Shunshun acquisition, a gain on remeasurement of fair value, as of the purported acquisition date of July 31, 2016, of $25,225,611. TAL further reported, in connection with the Shunshun acquisition, that Shunshun had deferred revenues of $24,750,882 upon the date of acquisition.

183. The 2017 20-F also stated:

> In December 2015, the Group acquired 30% equity interest in Shunshun Bida, which primarily provides study abroad intermediary service. On July 31, 2016, the Group increased its shareholding to 66% with cash consideration of $19,119,796 and common shares issued with fair value of $13,558,991 on the acquisition date. The settlement was made in fiscal year 2017. ***The Group obtained control of the acquiree and applied acquisition method of accounting***

> ***on the acquisition date.***

(Emphasis added.)

184. With respect to GZ 1-1, the 2017 20-F stated:

> In November 2016, the Group surrendered a portion of Series C convertible redeemable preferred shares of Changing Education Inc. ("Changing") in exchange for Guangzhou Tutoring valued at $50 million, which was formerly a component of the Group and disposed to Changing in part of the Group's investment on Series C convertible redeemable preferred shares in August 2015.
>
> Due to business focus realignment, Changing concluded that Guangzhou Tutoring no longer fits well with its overall business strategy and decided to exit its ownership and operation of Guangzhou Tutoring. Changing approached the Group and negotiated the terms which both parties agreed on the valuation and the exchange.

185. The statements in ¶¶181-84 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That TAL's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated. GAAP requires accounting to reflect the substance of a transaction over its legal form;

b. That TAL's previously reported results for FY 2016, which were repeated in the 2017 20-F, were materially misstated for the reasons set forth in ¶176;

c. That the $25,225,611 gain on remeasurement of TAL's initial investment in Shunshun was improper for the reasons set forth in Section IV.B and in violation of GAAP;

d. That TAL had actually obtained control of Shunshun as of the date of its original investment (*i.e.*, in connection with the June 2015 Purchase), not on the subsequent purported acquisition date of July 31, 2016;

e. That the June 2016 Purchase of additional shares of Shunshun was a related party

transaction and was structured to artificially create a valuation gain;

f. As a result of the foregoing, TAL's net income for FY 2017 was overstated by approximately $25.2 million (roughly 28.9%) and its basic net income per ADS and diluted net income per ADS were overstated by the same percentage;

g. That the reported deferred revenues of Shunshun of $24,750,882 was overstated by at least $19.7 million and that this overstated deferred revenue entry could and would be used as a "cookie jar" to improperly recognize revenues in future periods;

h. That the purported re-acquisition of GZ 1-1 was fictitious and lacked economic substance because TAL had never transferred GZ 1-1 in the first place, and that this purported re-acquisition was used to further conceal the improper $50 million gain that had been previously recognized in violation of GAAP and was still maintained in the Company's financial statements; and

i. As a result of the foregoing, TAL's financial results and financial statements misrepresented the Company's true financial condition, operations, and prospects.

186. The 2017 20-F was signed by Defendant Zhang. In addition, attached as Exhibits 12.1 and 12.2 to the 2017 20-F were SOX 302 Certifications, signed by Defendants Zhang and Luo, respectively, which were substantively identical to the SOX 302 Certifications of Zhang and Luo in TAL's 2016 20-F quoted in ¶178. Attached as Exhibits 13.1 and 13.2 to the 2017 20-F were SOX 906 Certifications, signed by Defendants Zhang and Luo, respectively, which were substantively identical to the SOX 906 Certifications of Zhang and Luo in TAL's 2016 20-F quoted in ¶179.

187. The SOX 302 Certifications and SOX 906 Certifications attached to the 2017 20-F were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth in ¶185. These

certifications were further materially false and/or misleading because, as a result of the transactions described above, TAL lacked adequate internal controls over financial reporting and the false certifications accompanying TAL's Annual Reports failed to disclose Defendants' illicit accounting scheme.

### C. Defendants' False And Misleading Statements Disseminated To The Market On June 26, 2018

188. On June 26, 2018, TAL filed with the SEC a materially false and misleading Form 20-F for the fiscal year ended February 28, 2018 (the "2018 20-F"). In the 2018 20-F, TAL repeated that it had earned a net income of $102,756,200 in FY 2016 and that it had earned a net income of $112,490,000 in FY 2017.[41]

189. The 2018 20-F also repeated the following statement originally made in the 2017 20-F:

> In December 2015, the Group acquired 30% equity interest in Shunshun Bida, which primarily provides study abroad intermediary service. On July 31, 2016, the Group increased its shareholding to 66% with cash consideration of $19,119,796 and common shares issued with fair value of $13,558,991 on the acquisition date. The settlement was made in fiscal year 2017. ***The Group obtained control of the acquiree and applied acquisition method of accounting on the acquisition date***.

(Emphasis added.)

190. The statements in ¶¶188-89 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a. That TAL's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated. GAAP requires accounting to reflect the substance of a transaction over its

[41] The per ADS figures were adjusted due to an adjustment in the ratio of TAL's common shares to ADS. As TAL explained in the 2018 20-F, "Effective on August 16, 2017, we adjusted the ratio of our ADSs to Class A common shares from one ADS representing two Class A common shares to three ADSs representing one Class A common share. All earnings per ADS figures in this report give effect to the foregoing ADS to share ratio change."

legal form;

b. That TAL's previously reported results for FY 2016, which were repeated in the 2018 20-F, were materially misstated for the reasons set forth in ¶176;

c. That TAL's previously reported results for FY 2017, which were repeated in the 2018 20-F, were materially misstated for the reasons set forth in ¶185;

d. That TAL had actually obtained control of Shunshun as of the date of its original investment (*i.e.*, in connection with the June 2015 Purchase), not on the subsequent purported acquisition date of July 31, 2016; and

e. That TAL's failure to correct its historical overstatements of net income in FY 2016 and FY 2017 and its repetition of those misstatements constituted an ongoing fraud and painted a materially misleading picture of TAL's true financial condition, operations, and prospects.

191. The 2018 20-F was signed by Defendant Zhang. In addition, attached as Exhibits 12.1 and 12.2 to the 2018 20-F were SOX 302 Certifications, signed by Defendants Zhang and Luo, respectively, which were substantively identical to the SOX 302 Certifications of Zhang and Luo in TAL's 2016 20-F quoted in ¶178. Attached as Exhibits 13.1 and 13.2 to the 2018 20-F were SOX 906 Certifications, signed by Defendants Zhang and Luo, respectively, which were substantively identical to the SOX 906 Certifications of Zhang and Luo in TAL's 2016 20-F quoted in ¶179.

192. The SOX 302 Certifications and SOX 906 Certifications attached to the 2018 20-F were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, for the same reasons set forth in ¶190. These certifications were further materially false and/or misleading because, as a result of the transactions described above, TAL lacked adequate internal controls over financial reporting and

the false certifications accompanying TAL's Annual Reports failed to disclose Defendants' illicit accounting scheme.

## VI. LOSS CAUSATION

193. On June 13, 2018, during trading hours, analyst firm Muddy Waters published a report on TAL, which is attached as Exhibit 2 to this Complaint and incorporated herein by reference. Muddy Waters' report revealed that:

a. TAL's claim that it sold GZ 1-1 in August 2015 was false, as TAL had never disposed of GZ 1-1, and TAL improperly recognized net income of $37.5 million from the disposition that never happened

b. TAL controlled Shunshun from the date of the June 2015 Purchase;

c. TAL improperly recognized $25.2 million from the revaluation of its interest in Shunshun following the June 2016 Purchase.

194. On this news, the Company's share price fell $4.54 per share, or approximately 9.95%, to close at $41.11 per share on June 13, 2018, on unusually heavy trading volume, damaging investors.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

195. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding TAL, their control over, and/or receipt and/or modification of TAL's allegedly materially misleading misstatements

and/or their associations with the Company which made them privy to confidential proprietary information concerning TAL, participated in the fraudulent scheme alleged herein.

196. Defendants attempted to conceal DFRL's round-trip. TAL's 2017 20-F provided that:

> TAL Beijing, Beijing Dongfangrenli ***Science & Commerce Co., Ltd.***, or Beijing Dongfangrenli, and its original shareholders entered into a series of contractual arrangements on December 27, 2011. In August 2015, all of the equity interests of Beijing Dongfangrenli were transferred as part of our consideration in a purchase agreement for a long-term investment. Thus TAL Beijing, Beijing Dongfangrenli and its original shareholders entered into a VIE Termination Agreement in July 2015. TAL Beijing approved to sign the VIE Termination Agreement by a written resolution. The pledges of the equity interests in Beijing Dongfangrenli were deregistered with the relevant local branch of the SAIC in August 2015. As a result, the ownership structure of Beijing Dongfangrenli and TAL Beijing have been legally terminated.

197. The 2017 20-F also included a list of TAL's subsidiaries. There, TAL referred to DFRL as "Beijing Dongfangrenli ***Trade Development Co., Ltd***".

198. By changing DFRL's English-language name and failing to disclose DFRL's purchaser's identity, Defendants concealed that DFRL had simply taken a round trip through which its value had doubled in a year.

## VII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

199. The market for TAL's ADSs was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, TAL's securities traded at artificially inflated prices during the Class Period. On June 8, 2018, the Company's share price closed at a Class Period high of $46.80 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of TAL's securities and market information relating to TAL, and have been damaged thereby.

200. During the Class Period, the artificial inflation of TAL's shares was caused by the

material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about TAL's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of TAL and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

201. At all relevant times, the market for TAL's securities was an efficient market for the following reasons, among others:

a. TAL ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

b. On average, more than 2% of TAL's total ADSs outstanding were traded weekly during the Class Period;

c. As a regulated issuer, TAL filed periodic public reports with the SEC and/or the NYSE;

d. TAL regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. TAL was followed by numerous securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force

and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace.

f. More than ten market makers made a market in TAL's ADSs during the Class Period;

g. TAL met the criteria to file an F-1 Registration Statement during the Class Period; and

h. The price of TAL's ADSs responded quickly to incorporate and reflect new public information concerning TAL during the Class Period.

202. As a result of the foregoing, the market for TAL's securities promptly digested current information regarding TAL from all publicly available sources and reflected such information in TAL's share price. Under these circumstances, all purchasers of TAL's securities during the Class Period suffered similar injury through their purchase of TAL's securities at artificially inflated prices and a presumption of reliance applies.

203. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII. NO SAFE HARBOR

204. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of TAL who knew that the statement was false when made.

## IX. CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants TAL, Zhang and Luo

205. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

206. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase TAL's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each

defendant, took the actions set forth herein.

207. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for TAL's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

208. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about TAL's financial well-being and prospects, as specified herein.

209. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TAL's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about TAL and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

210. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives

and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

211. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing TAL's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

212. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of TAL's securities was artificially inflated during the Class Period. In ignorance of the fact that

market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired TAL's securities during the Class Period at artificially high prices and were damaged thereby.

213. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that TAL was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their TAL securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

214. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

215. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

216. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

217. Individual Defendants acted as controlling persons of TAL within the meaning of

Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

218. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

219. As set forth above, TAL and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 3, 2019

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Lesley F. Portnoy*
Lesley F. Portnoy (LP-1941)
230 Park Avenue, Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

*Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR-5733)
Yu Shi, Esq. (YS-2182)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
info@rosenlegal.com

*Additional Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
Sherin Mahfavian, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com
sherin@schallfirm.com

*Additional Counsel for Plaintiffs*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On January 3, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 3, 2019.

*s/ Lesley F. Portnoy*
Lesley F. Portnoy