UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-05-19

| | |
|---|---|
| EDWARD LEA and DIOS ASSET MANAGEMENT PTE. LTD., Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | 18 Civ. 5480 (LAP) |
| -against- | <u>OPINION & ORDER</u> |
| TAL EDUCATION GROUP, BANGXIN ZHANG, YUNFENG BAI, and RONG LUO, | |
| Defendants. | |

LORETTA A. PRESKA, Senior United States District Judge:

Plaintiffs Edward Lea and Dios Asset Management PTE. LTD.
("Plaintiffs") bring the instant securities class action
complaint against TAL Education Group ("Company"), Bangxin
Zhang, Yunfeng Bai, and Rong Luo (collectively, "Defendants").
Plaintiffs assert claims of securities fraud under Section 10(b)
of the Securities Exchange Act of 1934 (the "Exchange Act") and
Securities and Exchange Commission Rule 10b-5 promulgated
thereunder. Plaintiffs also allege violations of Section 20(a)
of the Exchange Act. Plaintiffs' claims stem from their
purchase of Ohr common stock. (Amended Complaint ("Am.
Compl."), dated Jan. 3, 2019 [dkt. no. 23], at ¶ 199).

Defendants now move to dismiss the amended complaint
pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and

1

12(b)(6) and Section 101(b) of the Private Securities Litigation
Reform Act ("PSLRA") for, inter alia, failure to plead with the
specified particularity and failure to state a claim upon which
relief may be granted.

For the reasons stated below, Defendants' motion is
granted.

I.   Background

The Company is incorporated in the Cayman Islands and
provides education services in China.  (Am. Compl. at ¶¶ 2, 19).
Plaintiffs allege that the Company and its executives committed
securities fraud based on two grounds – what they call the GZ 1-
1 fraud and the Shunshun fraud.  (Id. at 7-8, 21).  When these
alleged frauds were exposed by the short-selling research firm
Muddy Waters, the stock price precipitously declined.  (Id. at
¶¶ 12, 13).

A. GZ 1-1 Allegations

Plaintiffs allege that Defendants' sale of their tutoring
business, GZ 1-1, was a sham transaction that caused the
Company's income to be overstated.  (Id. at ¶ 27).  In August
2015, the Company transferred GZ 1-1 to Changing Edu for $50
million in Changing Edu preferred shares.  (Id. at ¶ 25).  In
November 2016, little more than a year after the GZ 1-1 sale,
the Company bought back GZ 1-1 for $50 million, the same price

it had sold the entity. (Id. at ¶ 26). Plaintiffs allege that there was no actual transfer. (Id. at ¶ 27). The sham transaction was devised so that the Company could "improperly recognize a $50 million pre-tax gain from the purported sale." (Id.) The reason Changing Edu went along with the sham is because the Company had invested $36.3 million in Changing Edu, making up 28% of the $130 million Changing Edu had raised. (Id. at ¶ 28).

Plaintiffs point to a number of reasons why the transaction was a sham. Plaintiffs allege that the Company still controlled GZ 1-1 after its purported sale. (Id. at ¶ 45). GZ 1-1 said that it operated under the Company in the "About Us" section of the GZ 1-1 website both a month and year after the transaction. (Id. at ¶ 49, 50). The Company is alleged to have continued paying for and remained on the lease of GZ 1-1's learning centers. (Id. at ¶ 57). Plaintiffs allege they have "independently confirmed[] that TAL was still paying the rent for – and remained the lessee of – GZ 1-1's learning centers." (Id.) Muddy Waters conducted interviews with GZ 1-1 employees, one of whom says he was paid by the Company even after GZ 1-1 was sold. (Id. at ¶ 65).

In further support of an allegation of a sham transfer, Plaintiffs point to the Company's failure to transfer any

3

deferred revenue to Changing Edu. (Id. at ¶¶ 67-69). The State
Administration for Industry and Commerce ("SAIC") – a Chinese
securities regulator – did not show that there was evidence of a
transfer. (Id. ¶¶ 70-76). The Company allegedly controlled
Shujia, the Changing Edu entity that owned GZ 1-1, and Shujia's
financials did not include GZ 1-1's business. (Id. at ¶¶ 77,
83). Finally, as evidence of a sham transaction, Plaintiffs say
that the Company did not give a good reason why it would buy GZ
1-1 back at the same price a little over a year later simply
because Changing Edu did not believe it was a good fit for its
own business model. (Id. at ¶ 92).

Plaintiffs allege that as a result of the alleged sham
transaction, the Company improperly increased net income $37.5
million. (Id. at ¶ 42).

B. Shunshun Allegations

Shunshun was a startup that the Company first invested in
in June 2015. (Id. at ¶ 107). Plaintiffs allege that
Defendants did not disclose that Shunshun was a TAL variable
interest entity ("VIE") until after it was required to do so.
(Id. at ¶ 94). This resulted in what Plaintiffs allege was an
overstating of net income by $25.2 million. (Id. at ¶ 95).

The Company's first investment in Shunshun gave it 30% of
the company, which was "on paper . . . a mere minority position

4

in Shunshun." (Id. at ¶ 94). But Plaintiffs allege Defendants were really in control of Shunshun. (Id. at ¶ 114).

Plaintiffs allege this based on a number of facts. They point to the Company's selection of Shunshun's new CEO, Yang Zhang ("Zhang"), and claim the Company set his compensation by basing the largest portion of his compensation on "the value he might realize by selling his Shunshun shares," allegedly to the Company for "more than their fair share." (Id. at ¶ 115). Zhang told an interviewer, "[The Company's] top management classifies us just like a business unit." (Id. at ¶ 116). The Company also used language in job advertisements that in Chinese "indicat[ed] that [the Company] control[led] Shunshun." (Id. at ¶ 117). In sharing its client lists including over 300,000 students, the Company provided resources to Shunshun. (Id. at ¶ 118). The Company also allegedly instructed Shunshun's senior management on how to carry out their obligations by holding a single training session. (Id. at ¶ 119).

Plaintiffs allege that because of these facts, the Company controlled Shunshun and was required to, but did not, consolidate Shunshun's financial statements into its own and list it as a VIE. (Id. at ¶ 120).

Plaintiffs allege that in May 2016, Zhang's wife established an entity called Minqing into which Zhang and others

transferred shares that represented 36% of Shunshun. (Id. at ¶¶ 123-24). The Company paid $32.7 million for those shares, and Minqing was then deregistered. (Id. at ¶ 125).

The Company used the Fair Value calculation to recognize gains on its investment. (Id. at ¶ 134). Both because it controlled Shunshun and its purchase was from a related party, i.e., Minqing, Plaintiffs allege that using the Fair Value calculation was improper and overstated income. (Id. at ¶ 135).

### C. Scienter

Plaintiffs say that the various materially false or misleading statements demonstrate that the fraud was either made knowingly or severely recklessly. (Id. at 39-48). Plaintiffs say that because individual defendants participated in the fraudulent scheme and had knowledge of the untrue facts, they participated in the alleged fraudulent schemes. (Id. at ¶ 195).

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). Moreover, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citations omitted). In assessing whether a plaintiff has met this standard, the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation omitted).

Particularly relevant here, plausibility depends on a number of factors including "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the district court is normally required to look only to the allegations on the face of the complaint." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007). However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a

motion under Rule 12(b)(6)." Id. Accordingly, the Court "may

consider any written instrument attached to the complaint,

statements or documents incorporated into the complaint by

reference, legally required public disclosure documents filed

with the SEC, and documents possessed by or known to the

plaintiff and upon which it relied in bringing the suit." ATSI

Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.

2007).[1]

Securities fraud claims must also meet the heightened

pleading requirements under Federal Rule of Civil Procedure 9(b)

("Rule 9(b)") and PSLRA, 15 U.S.C. § 78u-4(b). ATSI Commc'ns,

493 F.3d at 99. A complaint alleging securities fraud must

abide by Rule 9(b)'s requirement that "the circumstances

constituting fraud . . . shall be stated with particularity."

Fed. R. Civ. P. 9(b). "A securities fraud complaint based on

misstatements must (1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the

statements were fraudulent." ATSI Commc'ns, 493 F.3d at 99.

"[I]f an allegation regarding the statement or omission is made

on information and belief, the complaint shall state with

---

[1] Plaintiffs move to strike [dkt. no. 36] a number of documents
submitted by Defendants in their motion to dismiss. The Court
did not rely on material objected to. Therefore, Plaintiffs'
motion to strike is denied as moot.

particularity all facts on which that belief is formed." 15
U.S.C. § 78u-4(b)(1).

The PSLRA applies to the element of scienter. ATSI
Commc'ns, 493 F.3d at 99. Scienter is "'a mental state
embracing intent to deceive, manipulate, or defraud.'" Tellabs,
Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (quoting
Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). In
order to plead scienter adequately, "'the complaint shall, with
respect to each act or omission alleged to violate this chapter,
state with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind.'" Id.
at 334 (quoting 15 U.S.C. § 78u-4(b)(2)).

III. Discussion

To recover damages in a private securities-fraud action
under § 10(b) of the Exchange Act, a plaintiff must prove "(1) a
material misrepresentation or omission by the defendant; (2)
scienter; (3) a connection between the misrepresentation or
omission and the purchase or sale of a security; (4) reliance
upon the misrepresentation or omission; (5) economic loss; and
(6) loss causation." Amgen Inc. v. Connecticut Ret. Plans & Tr.
Funds, 568 U.S. 455, 460-61 (2013). To make out a prima facie
case under § 20(a) of the Exchange Act, a plaintiff must show a
primary violation, such as of § 10(b). Ganino v. Citizens

Utilities Co., 228 F.3d 154, 170 (2d Cir. 2000). In other words, if there is no § 10(b) violation, there is no § 20(a) violation.

For the following reasons, Plaintiffs fail to plead either a material misrepresentation or omission or scienter. They therefore have not plead either a § 10(b) or a § 20(a) violation.

a. Misrepresentation or Omission

At issue in both alleged frauds is the question of corporate control. This is because the allegedly false accounting statements were based on the Company's determination and presentation that it did not control GZ 1-1 and Shunshun. Defendants characterize the accounting statements at issue in this case as subjective judgment calls and not objective facts. (Memorandum Of Law In Support Of Defendant's Motion To Dismiss The Amended Complaint ("Def. Br."), dated Feb. 26, 2019 [dkt. no. 29], at 9).

While in certain instances subjective judgment is required in making accounting determination, such as what inventory is "excess," in other instances, opinions can be true or false. Compare Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-538 (1979) (Taxpayers bear a "heavy burden of proof" because the Commissioner is vested with "wide discretion in determining

10

whether a particular method of inventory accounting should be disallowed as not clearly reflective of income." Thus, because Plaintiff did not provide objective evidence of its "excess" inventory, it was inconsistent with the Regulations and the Commissioner properly disallowed it.) with Fait v. Regions Fin. Corp., 655 F.3d 105, 111 (2d Cir. 2011) ("The statements regarding goodwill . . . are subjective ones rather than 'objective factual matters.'" Therefore, because Plaintiff did not point to any objective standard that Defendant should have used in determining goodwill, Plaintiff did not have a valid claim.)

A finding of control is less like a goodwill determination because objective evidence can more easily be identified with regard to control. Control vel non is a quality the legal system deals with regularly in an objective manner, e.g., in making an alter ego finding for foreign sovereign immunity purposes, a court must determine whether the sovereign extensively controls the entity in question. See EM Ltd. v. Banco Cent. De La Republica Argentina, 800 F.3d 78, 90 (2d Cir. 2015).

Plaintiffs on both alleged frauds, however, are unable to establish falsity or material misrepresentation. In both instances, at most, Plaintiffs are able to point to a few stars

in the night sky, not draw a constellation of control.  This is primarily because each star has an "alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs Inc., 647 F.3d at 430.

      i.    GZ 1-1

Plaintiffs point to a number of factors in establishing the Company's control over GZ 1-1.  The Court will address each.

On the SAIC filings, Plaintiffs say that Shujia's 2015 and 2016 SAIC financials did not include GZ 1-1's business.  (Am. Compl. at ¶ 83).  Both parties cite to In re L & L Energy, Inc. for support.  2013 WL 6244654 (W.D. Wash. Dec. 3, 2013).  While it is true that the case does stand for the proposition that one entity's financials can be used to establish an unrelated entity's fraud, the court noted that there were actual "particularized facts giving rise to a strong inference" one company did not actually own or have the right to control the revenue streams of another.  Id. at *3.  These particularized facts included an entity's affirmatively claiming that another entity never acquired legal or equitable interest in a particular mine.  Id.  This is an objective fact and not mere speculation.

Contrast that with the instant case where Plaintiffs try to have their cake and eat it too.  If the Company really

12

controlled Shujia, then in order to effect its fraudulent

scheme, the Company would have simply had Shujia incorporate GZ

1-1's business into its financials.  There is no allegation that

GZ 1-1's revenues remained on the Company's books and so there

was no risk of double counting.  It may certainly be the case

that the Company simply overlooked this part of its scheme and

had it known it would have included GZ 1-1's revenues.  But

Plaintiffs' current allegation is insufficient because merely

leaving out financials does not give rise to a "strong

inference" of control - there are many benign explanations as

well.

On GZ 1-1's continuing to operate under the Company's name,

Plaintiffs misunderstand the point about a "grace period."

Corporate reorganizations take time and are not seamless -

certain aspects of transformations get overlooked, and it is not

just by "grace" that these changes do not occur.  Changes can

fail to occur through simple oversight.  That is why the Court

is not persuaded when Plaintiffs say, "[I]t is unbelievable that

[the Company] would permit this grace period to last for a

year."  (Plaintiffs' Memorandum Of Law In Opposition To

Defendant's Motion To Dismiss The Amended Complaint ("Pl.

Opp."), dated Apr. 22, 2019 [dkt. no. 35], at 13).  Job

advertisements and "About Us" website sections take time to

change and are neither necessary nor sufficient to establish

continued control.  Indeed, here, the language "under TAL flag"
was eventually removed.  (Compare Def. Br. Ex. 16 with Ex. 17).

On the lack of an accounting for deferred revenue in SEC
filings, Plaintiffs concede that there was an "oblique
reference" to deferred revenues transferred to Changing.  (Pl.
Opp. at 13).  This directly contradicts the Amended Complaint
which says there was "no evidence of any transfer of deferred
revenue to Changing Edu."  (Am. Compl. at ¶ 69) (emphasis
added).  Upon being pointed out that there was, in fact,
evidence of transferred or deferred revenue, Plaintiff tries to
shift the burden to force Defendants to explain why such a
reference was "clear."  (Pl. Opp. at 13).  This is not
Defendants' burden; Plaintiff must show particularized facts
establishing a strong inference of material misrepresentation,
not that certain statements need to be more "clear."  As the
Court of Appeals has said, it is not incumbent on defendants to
provide plaintiffs with all facts "that would have potentially
undermined [d]efendants'" statements.  Tongue v. Sanofi, 816
F.3d 199, 212 (2d Cir. 2016).

On the Company's paying of leases of units occupied by GZ
1-1 training centers after the sale, Plaintiffs say that
Defendants simply deny their allegations which is an
inappropriate response on a motion to dismiss.  (Pl. Opp. at

14

13). Putting aside the question of whether the Court can look at certain leases, even if the Court assumes what is in the Amended Complaint vis-à-vis the leases, it is not enough to demonstrate control. It is certainly neither necessary nor sufficient for one entity to pay another's lease to demonstrate that the first entity controls the second. Under a whole plethora of benign reasons, one entity may pay the lease of another. As Defendants point out, "Plaintiffs are silent on whether the lease terms would have permitted the legal obligation to be transferred . . . . In any event . . . these expenses were offset against the 'amounts due' to Changing." (Def. Br. at 12). Additionally, these allegations say nothing about the other leases of GZ 1-1. It is not alleged that this was the case for even a majority of GZ 1-1's leases.

On the Company's failure to transfer teaching contracts to GZ 1-1, Plaintiffs point to one employee who says he or she was paid by the Company during the relevant period, one teacher who says GZ 1-1 had always been part of the Company, and a former GZ 1-1 Head of School who said that GZ 1-1 was "never purchased" by Changing. (Am. Compl. at ¶ 65). There is no reliance on specific contracts or individuals – nothing is particularized. Furthermore, it is not clear why a teacher or even a Head of School would be in a position to opine on corporate reorganizations; the only statement that would be relevant would

15

be the teacher who says he or she was not paid by GZ 1-1. This, however, is simply a bare assertion that does not pass the heightened pleading standard under the PSLRA.

On the implausibility of selling GZ 1-1 only to purchase it a year later for the same price, this is simply an assertion made by Plaintiffs. (Am. Compl. at 20). There are a number of reasons why an entity could command the same price one year later, for example, changing economic circumstances, changing business needs, or realizing a mistake. Nevertheless, the burden is on the Plaintiff to plead that the reason for the scheme was to effect a fraud. Defendants do not have to plead an alternative explanation.

### ii. Shunshun

Plaintiffs point to a number of factors in establishing the Company's control over Shunshun. It is worth noting that in its prolix Amended Complaint, Plaintiffs devote fewer than 10 paragraphs to establishing the nub of the fraud here – that the Company controlled Shunshun.

Plaintiffs say that the Company installed Zhang, convinced him that Shunshun would have the Company's full backing, and controlled his compensation by "engineering undisclosed related party transactions with him through a straw company." (Pl. Opp. at 15).

As a threshold matter, this final point begs the question –
Plaintiffs are trying to prove that the Company controlled
Shunshun and as support they point to an alleged "undisclosed
related party transaction." (Id.) But the reason they argue
the transaction was one with a related party was because the
Company controlled Shunshun – exactly what the argument is
trying to prove. On the CEO, Plaintiffs' arguments fail for
other reasons. First, Plaintiffs say, "Zhang's decision to join
Shunshun makes no sense unless it was coupled with a significant
cash investment from a third party . . . Zhang only agreed to
become Shunshun's head because the Company's investment and
DFRL's license[2] . . . would give Shunshun a fresh start." (Am.
Compl. at ¶ 109). Far from showing nefarious machinations
evincing control, these allegations show an individual who is
optimistic about the business prospects of a company based on
new investment and changed circumstances. That Zhang thought
his shares would appreciate and a minority shareholder could
become a majority shareholder is evidence of an entrepreneurial
calculation, not external pressure from the Company.

On Zhang's interview with Study Abroad Talk, the Court is
not impressed by Plaintiffs' selective quotation. In the
article, Plaintiffs quote Zhang as saying Shunshun was "in very

---

[2] Shunshun could not operate as an overseas education
intermediary without this license. (Am. Compl. at ¶ 109).

close talks with [the Company] about deep integration, and all
of [the Company's resources] will be open to us." (Am. Compl.
at ¶ 116). Plaintiffs do not mention that Zhang qualified this
integration by saying, "But [the Company] is very respectful of
our independence, which is to say that [the Company] still
let[s] me run the business. Moreover, we have begun an
extremely deep strategic alliance with them." (Def. Br. Ex. 13
at 5). This puts the original quotation in its proper context –
two distinct and independent entities working together for
mutual benefit. The integration and resources were to be used
by this independent entity for its own betterment in a way that
would also redound to the good of the Company. Leaving out this
part of the interview is poor form.

Plaintiffs respond by saying, "While [] Zhang stated in
passing that he had day-to-day operational independence, even
taking his self-aggrandizing statement at face value, the same
could be said of many 100%-owned subsidiaries." (Pl. Opp. at
16). This is an incredible argument. Plaintiff first argues
that the Company's control over Shunshun is effectuated through
the placement of Zhang as CEO. Plaintiff then tells the Court,
wholly-owned subsidiaries are regularly operationally
independent. This second argument goes that operational
independence does not prove non-control. The Court would remind
Plaintiffs, however, that there is another class of companies

18

that are operationally independent – non-controlled independent companies. Plaintiffs want to have their cake and eat it too. They want to tell the Court Zhang's very placement as CEO is evidence of the Company's control without giving any specific instances of his carrying out its will. Then they want to tell the Court that he is operationally independent but that fact should not cut against a finding of control. This is more question begging, however. Plaintiff is trying to shift the burden to Defendants to prove why the Company did not control Zhang and Shunshun. The icing here is that Plaintiffs are willing to credit the excerpts of Zhang's interview that benefit them and look askance at statements from the same interview they label "self-aggrandizing."

The other indicia pointed to by Plaintiffs fail to convince the Court. For instance, the Company's sharing its client list with Shunshun is neither necessary nor sufficient to establish control. It is not necessary because a parent company could have a number of reasons not to share client lists. It is not sufficient because a passive minority investor without control could certainly share information or make a referral to help his investment. Likewise, the Company's ordering Shunshun's employees and senior staff to travel to undergo orientation led by the Company's CEO is neither necessary nor sufficient towards establishing control.

Finally, Plaintiffs implicitly concede that the dispositive question before the Court is whether the Company controlled Shunshun. Defendants argue they were not required to disclose the June 2016 transaction as a related-party transaction. Plaintiffs do not dispute that whether they were required to disclose hinged on the assumption that Shunshun was not controlled by the Company. (Pl. Opp. at 16).

b. Scienter

A plaintiff may plead scienter by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. Conscious recklessness implies "a state of mind approximating actual intent, and not merely a heightened form of negligence." South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009).

Plaintiffs rely on the alleged sham transactions themselves as evidence of scienter saying, "[T]ransactions do not fake themselves." (Pl. Opp. at 19). Plaintiffs' argumentation boils down to the following syllogism: 1) the two transactions were fraudulent, 2) senior management knew or should have known, as a matter of law, that certain transactions take place, therefore 3) Defendants had the requisite scienter. Novak v. Kasaks, 216

F.3d 300, 308 (2d Cir. 2000). As stated above, the Court disputes the first premise of the syllogism – there is no material misrepresentation here so there can be no scienter. The Court does not reach Defendants' other arguments.

   IV.   Conclusion

   For the reasons stated above, Defendants' motion to dismiss [dkt. no. 27] is granted and Plaintiff's motion to strike [dkt. no. 36] various documents is denied as moot. The Clerk of the Court shall mark the action closed and deny all pending motions as moot.

   SO ORDERED.

Dated:     New York, New York
           September 25, 2019

_____
LORETTA A. PRESKA
Senior United States District Judge