**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE TAL EDUCATION GROUP
SECURITIES LITIGATION

Case No. 1:18-cv-05480-LAP-KHP

---

**DECLARATION OF KARA M. WOLKE IN SUPPORT OF: (I) PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF
ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................... 2

II.     PROSECUTION OF THE ACTION .................................................................... 6

        A.      Background ................................................................................................. 6

        B.      Commencement of the Action and Appointment of Lead Plaintiffs and Lead
                Counsel ....................................................................................................... 6

        C.      The Comprehensive Pre-Filing Investigation and the Preparation of the
                Complaint.................................................................................................... 7

        D.      Defendant's Motion to Dismiss the Complaint and Plaintiffs' Response ............. 8

        E.      Plaintiffs' Appeal to the Second Circuit and Defendant's Answer ..................... 10

        F.      Fact Discovery ......................................................................................... 10

        G.      Preparation for Class Certification............................................................ 13

        H.      Mediation Efforts, Settlement Negotiations, and the Settlement's Preliminary
                Approval ................................................................................................... 13

III.    THE RISKS OF CONTINUED LITIGATION .................................................. 14

        A.      Risks Faced in Obtaining and Maintaining Class Action Status ......................... 14

        B.      Challenges to Obtaining Discovery ................................................................ 15

        C.      Risks to Proving Liability .............................................................................. 17

        D.      Risks to Proving Loss Causation and Damages.................................................. 18

        E.      Other Risks, Including Trial, Appeals, and Ability To Collect a Judgment ......... 19

        F.      The Settlement is Reasonable in Light of Potential Recovery in the Action........ 21

IV.     PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL
        ORDER REQUIRING ISSUANCE OF THE NOTICE .................................................. 22

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT .......................... 25

VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT
        OF LITIGATION EXPENSES......................................................................................... 28

i

A.      The Fee Application .......................................................................... 28

        1.      The Excellent Outcome Achieved is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action ............................ 29

        2.      The Magnitude and Complexity of the Action ......................................... 31

        3.      The Significant Risks Borne by Plaintiffs' Counsel ................................ 32

        4.      The Quality of Representation, Including the Result Obtained, The Experience and Expertise of Plaintiffs' Counsel, and the Standing and Caliber of Defendants' Counsel ............................................................... 33

        5.      The Requested Fee in Relation to the Settlement .................................... 34

        6.      Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases ............. 34

        7.      The Reaction of the Settlement Class Supports Lead Counsel's Fee Request ..................................................................................................... 34

        8.      Lead Plaintiffs Support Lead Counsel's Fee Request .............................. 35

B.      Reimbursement of the Requested Litigation Expenses is Fair and Reasonable ... 35

VII.    CONCLUSION ....................................................................................... 38

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Edward Lea in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 2 | Declaration of Dios Asset Management PTE. LTD. in Support of: (1) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Declaration of Erica Shelton Regarding (A) Mailing of Notice and Claim Form; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion Received to Date |
| 4 | Declaration of Kara M. Wolke, Esq. In Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 5 | Declaration of Laurence M. Rosen, Esq. In Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of The Rosen Law Firm P.A. |
| 6 | Declaration of Brian Schall, Esq. In Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of The Schall Law Firm |
| 7 | Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review (NERA Jan. 25, 2021) |
| 8 | Table of Select Second Circuit Cases Awarding Attorneys' Fees Awards of 33% or Above Plus Expenses |
| 9 | Table of Securities Class Action Settlements Against China-Based Companies |
| 10 | Table of Law Firm Billing Rates |
| 11 | *In re NYSE Specialists Sec. Litig.*, No. 03-cv-8264, ECF No. 38 (S.D.N.Y. June 10, 2013) |

| 12 | *In re van der Moolen Holding N.V. Sec. Litig.*, No. 03 Civ 8284 (S.D.N.Y. Dec. 6, 2006) |
| 13 | *In re Cnova N.V. Sec. Litig.*, Master File No. 1:16-cv-00444-LTS-OTW, ECF No. 148 (S.D.N.Y. Mar. 20, 2018) |
| 14 | *Levine* v. *Atricure, Inc.*, No. 1:06-cv-14324-RJH, ECF No. 85 (S.D.N.Y. May 27, 2011) |
| 15 | *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 (S.D.N.Y. March 27, 2020) |
| 16 | *In re L.G. Philips LCD Co. Sec. Litig.,* No. 1:07-cv-00909-RJS, ECF No. 10 (S.D.N.Y. Mar. 17, 2011) |
| 17 | *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ 1773 (DAB), ECF No. 170 (S.D.N.Y. July 18, 2007) |
| 18 | *In re TeleTech Litig.*, No. 1:08-cv-00913-LTS, ECF No. 82 (S.D.N.Y. June 11, 2010) |
| 19 | *Anwar v. Fairfield Greenwich Ltd.*, No. 09-cv-118 (VM) (FM), ECF No. 1099 (S.D.N.Y. Mar. 28, 2013) |

I, Kara M. Wolke, declare the following pursuant to 28 U.S.C. §1746:

1.      I am an attorney duly licensed to practice law before all of the courts of the State of California and I am admitted *pro hac vice* in this action.  I am a partner in the law firm of Glancy Prongay & Murray LLP ("GPM"), Lead Counsel for Lead Plaintiffs Edward Lea and Dios Asset Management PTE. LTD ("Dios Asset Management," and together with Mr. Lea, "Plaintiffs") in the above-entitled action (the "Action").[1]

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently-filed memorandum in support thereof ("Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Plaintiffs seek final approval of the $7,500,000 Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      I also respectfully submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently-filed memorandum in support thereof ("Fee Memorandum").[2]  As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $174,013.14, which includes Plaintiffs' Counsel's total out-of-pocket litigation costs in the amount of $159,013.14, and a total of $15,000 to Plaintiffs ($7,500 each), pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement, dated November 24, 2021 (the "Stipulation").  ECF No. 74-1.

[2] Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses is made on behalf of Lead Counsel, The Rosen Law Firm, P.A. ("RLF"), and Schall Law Firm ("SLF," collectively, "Plaintiffs' Counsel").

their costs, including lost wages, incurred in connection with their representation of the Settlement Class.

4.      The Court preliminarily approved the proposed Settlement by Order dated July 2, 2021 (the "Preliminary Approval Order"), and thereby directed notice of the Settlement to be disseminated to the Settlement Class.  *See* ECF No. 77.  Pursuant to the Preliminary Approval Order, A.B. Data, Ltd. ("A.B. Data") the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.

5.      In total, 67,758 Notice Packets have been mailed to potential Settlement Class Members, and thus far, only two (2) requests for exclusion have been received and no objections.

## I.      INTRODUCTION

6.      This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act.  Plaintiffs asserted claims against defendant TAL Education Group ("TAL" or the "Company" or "Defendant") and defendants Bangxin Zhang, Yunfeng Bai, and Rong Luo (collectively, "Individual Defendants").[3]

7.      On January 3, 2019, Plaintiffs filed and served their Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), asserting violations of the Exchange Act.  ECF No. 23.  The Complaint alleged that TAL and Individual Defendants engaged in sham transactions that fraudulently inflated TAL's income, and resulted in the dissemination of materially false and misleading financial statements to the investing public.  The Complaint further alleged that the price of TAL's American Depositary Shares ("ADS") were

---

[3] The Individual Defendants were not served.

artificially inflated as a result of TAL's and Individual Defendants' allegedly false and misleading statements, and declined when the truth was revealed.  ECF No. 23.

8.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $7,500,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, Plaintiffs and Lead Counsel submit that the proposed Settlement represents an excellent result for the Settlement Class considering the posture of the Action as well as the significant risks to overcome remaining in the Action.

9.      Additionally, the $7,500,000 cash Settlement Amount is well within the range of reasonableness under the circumstances to warrant final approval of the Settlement.  Plaintiffs' damages expert estimates that if Plaintiffs had *fully prevailed* on their Exchange Act claims at both summary judgment and after a jury trial, if the Court certified the Class, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Plaintiffs' *best case scenario*—the total *maximum* damages would be approximately $141 million.  Thus, the $7,500,000 Settlement Amount represents approximately 5.3% of the total *maximum* damages *potentially* available in this Action.  Conversely, if Defendants' colorable disaggregation argument was accepted, the maximum recoverable damages would be drastically reduced or eliminated entirely.

10.     Indeed, a recovery above the 1.7% median settlement for securities litigation matters is well-within the range of reasonableness.  *See, e.g.*, Ex. 7 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021) at p. 20, Fig. 16 (median recovery in securities class actions in 2020 was approximately 1.7% of estimated damages).  Consequently, the amount recovered by Plaintiffs, when balanced against the risks of continued litigation, weighs strongly in favor of final approval.

11.     Indeed, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

12.     The Settlement was reached after nearly three years of contested litigation. Plaintiffs' Counsel's efforts involved, among other things: (a) conducting a detailed and substantive investigation into TAL and the facts forming the basis for the claims asserted in the Action, including retaining and working with private investigators in China and translators; (b) based on this investigation, filing the Complaint; (c) consulting with an expert in the fields of accounting, loss causation and damages; (d) researching, drafting, and filing an opposition to TAL's motion to dismiss and motion to strike; (e) researching, drafting, and filing an appeal of the Court's order granting TAL's motion to dismiss with prejudice, which was ultimately successful; (f) engaging in fact discovery, including but not limited to, (i) exchanging initial disclosures, (ii) serving and responding to requests for production of documents, (iii) negotiating the ESI protocol, (iv) producing and reviewing thousands of pages of documents, many of which were in Chinese, and (v) serving and responding to interrogatories; (g) substantially drafting Plaintiffs' anticipated motion for class certification; and (f) engaging in mediation and further negotiations with a well-respected neutral.

13.     In preparation for the mediation, Plaintiffs' Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendant's mediation statement. Following the exchange of detailed mediation statements addressing both liability and damages, Lead Counsel prepared for and engaged in full-day mediation session overseen by an experienced mediator of complex cases, Jed Melnick, Esq. of JAMS, which ended without an agreement to settle. However,

based on the significant submissions addressing both the factual and legal basis for the Parties' respective positions and the full-day session, which included direct discussions, Mr. Melnick conducted further negotiations over the course of several weeks. These negotiations culminated in the Parties accepting Mr. Melnick's recommendation to settle the Action for $7,500,000 on or about April 23, 2021. The proposed Settlement is, therefore, the result of arm's length negotiations between and among well-informed, highly experienced counsel, with the aid and oversight of an experienced neutral mediator.

14.     Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members. For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

15.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

16.     Finally, Lead Counsel, on behalf of Plaintiffs' Counsel, seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum. As discussed in detail in the accompanying Fee Memorandum, the requested 33⅓% fee is within the range of percentage awards granted by courts in this Circuit in comparable

securities class actions.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $159,013.14 and the requested reimbursements of costs, including lost wages, totaling $15,000 ($7,500 to each of the two Plaintiffs) pursuant to the PSLRA are also fair and reasonable.  Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Background

17.   Plaintiffs allege that TAL and Individual Defendants made materially false and misleading statements during the period of June 1, 2016 through June 13, 2018, inclusive (the "Settlement Class Period") concerning the sale and repurchase of TAL's subsidiary Guangzhou One-on-One tutoring business ("GZ1-1"), TAL's investment in an entity named Beijing Shunshun Bida Information Consulting Co. Ltd. ("Shunshun"), the financial reporting resulting from those transactions, and in the Sarbanes-Oxley certifications attesting to the accuracy of TAL's financial reporting and the adequacy of its internal controls.  As a result of the materially false and misleading statements made by TAL and Individual Defendants, Plaintiffs allege, the prices of TAL's publicly-traded ADS were artificially inflated and declined when the truth was revealed.

### B.   Commencement of the Action and Appointment of Lead Plaintiffs and Lead Counsel

18.   On June 18, 2018 and July 17, 2018, two class action complaints were filed in the United States District Court of the Southern District of New York, styled, *Lea v. TAL Education*

*Group et al.*, Case No. 1:18-cv-05480-RWS and *Extract v. TAL Education Group et al.*, Case No. 1:18-cv-06440-RWS.

19.     By Order dated September 27, 2018, the Court consolidated and recaptioned the cases as *In re TAL Education Group Securities Litigation*, Master File No. 1:18-cv-05480-RWS; (ii) appointed Mr. Lea and Dios Asset Management to serve as Lead Plaintiffs in the Action; and (iii) approved Plaintiffs' selection of GPM as Lead Counsel in the Action.  ECF No. 19.

**C.     The Comprehensive Pre-Filing Investigation and the Preparation of the Complaint**

20.     In preparation for filing the Complaint, Plaintiffs' Counsel conducted an extensive factual and legal investigation that included, among other things, review and analysis of (a) TAL's publicly filed documents with the U.S. Securities and Exchange Commission ("SEC") and the Chinese State Administration for Industry and Commerce, (b) public reports, blog posts, research reports prepared by securities and financial analysts, and news articles concerning TAL, (c) TAL's investor call transcripts, and (d) memoranda prepared by private investigators who located and interviewed former TAL employees and other potential witnesses with relevant information in the People's Republic of China ("PRC").  Plaintiffs' Counsel also conducted an exhaustive analysis of applicable case law, consulted with an expert in the fields of accounting, damages and loss causation, and an attorney fluent in Chinese who interpreted various news articles, filings, and other documents written in Chinese.

21.     On January 3, 2019, Plaintiffs filed and served the Complaint, asserting claims against TAL and Individual Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against Individual Defendants under Section 20(a) of the Exchange Act.  Among other things, the Complaint alleged that TAL and Individual Defendants made materially false and misleading statements concerning the sale and repurchase of TAL's GZ1-1,

TAL's investment in Shunshun, the financial reporting resulting from those transactions, and in the Sarbanes-Oxley certifications attesting to the accuracy of TAL's financial reporting and the adequacy of its internal controls.  As a result of the materially false and misleading statements made by TAL and Individual Defendants, Plaintiffs allege, the prices of TAL's publicly-traded ADS were artificially inflated and declined when the truth was revealed.

### D. Defendant's Motion to Dismiss the Complaint and Plaintiffs' Response

22.     On February 6, 2019, TAL moved to dismiss the Complaint.  ECF Nos. 27-29. Among other things, TAL argued that Plaintiffs failed to plead (a) the existence of a materially misleading statement or omissions, (b) a strong inference of scienter, and (c) loss causation. Specifically, Defendant argued that Plaintiffs' falsity allegations failed because they did not adequately allege facts demonstrating that the accounting treatment of the GZ1-1 and Shunshun transactions were incorrect.  Moreover, Plaintiffs failed to adequately plead scienter because (1) the Complaint is devoid of any allegations that TAL's senior management had any motive and opportunity to commit securities fraud and (2) Plaintiffs failed to point to any facts that contradict TAL's public statements and in light of TAL's extensive disclosures about the GZ1-1 and ShunShun transactions, as well as its decision to launch an internal investigation overseen by an independent audit committee the opposing inference, an inference of good faith, was in fact supported.  Finally, Defendant argued that Plaintiffs' single corrective disclosure—the Muddy Waters Report—was based on public sources and therefore cannot, as a matter of law, establish the requisite link between the Company's alleged misstatement and Plaintiffs' alleged loss.

23.     On April 22, 2019, Plaintiffs opposed TAL's motion to dismiss.[4]  ECF No. 35.

---

[4] Plaintiffs also filed and served a motion to strike certain exhibits attached to TAL's motion to dismiss (ECF Nos. 36-37), which TAL opposed on May 6, 2019 (ECF NO. 38).

Plaintiffs argued that the Complaint showed that, contrary to public statements, TAL never sold GZ1-1 and therefore never bought it back making the income TAL recognized fraudulent. As to the Shunshun transaction, Plaintiffs argued that the Complaint adequately alleged TAL's control over Shunshun based on, in part, on the reduction of the original owners' investment to a mere pittance, the installation of a hand-picked CEO to head it, and purported control over the new CEO's compensation and therefore making TAL's recognition of its purportedly minority interest fraudulent. Additionally, Plaintiffs argued that the Complaint adequately alleged scienter based on the fact that there is no accidental or even negligent explanation for sham transactions like the GZ1-1 sale and the purchase of Shunshun's shares from a straw at a grossly inflated valuation. Finally, Plaintiffs argued that the Complaint adequately alleged loss causation because contrary to Defendant's argument, the Muddy Waters Report did not rely on sources that were relevantly "public" but in fact relied on discussions with former TAL employees, private credit reports, and Chinese-language regulatory filings, blogs, and media articles – sources not considered public for purposes of the federal securities laws.

24. On May 22, 2019, TAL filed and served its reply papers in support of its motion to dismiss. ECF No. 42. That same day, Plaintiffs filed and served their reply papers in support of their motion to strike. ECF No. 41.

25. On September 25, 2019, the Court entered an opinion and order granting TAL's motion to dismiss in full with prejudice and ordered the clerk to close the case file. ECF No. 44. The Court held that Plaintiffs failed to allege actionable misrepresentations and omissions relating to the challenged transactions because, the Court concluded, Plaintiffs failed to allege a "'strong inference' of control" by TAL over their GZ1-1 business or Shunshun. The Court further held that because Plaintiffs failed to allege falsity, they also failed to allege scienter.

### E.    Plaintiffs' Appeal to the Second Circuit and Defendant's Answer

26.    On October 25, 2019, Plaintiffs filed a notice of appeal to seek review of the Court's dismissal order by the United States Court of Appeals for the Second Circuit.  ECF No. 46.  On February 7, 2020, Plaintiffs filed their opening appellate brief with the Second Circuit.  Plaintiffs argued that the Court misapplied the "strong inference" standard in relation to both falsity and scienter and the Complaint adequately alleged facts supporting Plaintiffs' claims that the GZ1-1 transaction was a sham and the Shunshun transaction was designed to mislead investors and manipulate the accounting rules to obtain a false paper gain.

27.    On May 28, 2020, TAL filed its response.  TAL argued that the Court had properly held that the Complaint did not adequately allege the GZ1-1 and Shunshun transactions were fraudulent.

28.    On June 18, 2020, Plaintiffs filed their reply brief with the Second Circuit.  The Second Circuit held oral argument on September 24, 2020.

29.    On November 25, 2020, the United States of Appeals for the Second Circuit issued an order reversing the Court's dismissal order and remanded the Action to the Court for further proceedings.  *Lea v. TAL Education Group*, 837 Fed.Appx. 20 (2d Cir. Nov. 25, 2020).

30.    On January 22, 2021, TAL filed and served its answer to the Complaint.  ECF No. 60.

### F.    Fact Discovery

31.    From December, 2020 to April, 2021, counsel for Plaintiffs and TAL began to engage in fact discovery.  On December 17, 2020, Plaintiffs and TAL participated in a conference pursuant to Rule 26(f) of the Federal Rules of Civil Procedure to discuss case management and discovery issues, and thereafter submitted their joint report to the Court's chambers on December 30, 2020.  On January 7, 2020, Plaintiffs and TAL participated in an initial case management

conference with the Court to discuss these issues, as well as a follow-up case management conference to discuss the status of discovery and settlement negotiations on March 31, 2021.

32.     Following the Rule 26(f) conference, Plaintiffs researched and drafted their initial disclosures, which the Parties exchanged on January 29, 2021.  On February 16, 2021, TAL produced copies of the insurance policies identified in its initial disclosures to Plaintiffs.

33.     On February 26, 2021, Plaintiffs produced documents to TAL previously identified in their initial disclosures, totaling approximately 3,719 pages, a substantial portion of which were written in Chinese in whole or in part, and so required review and analysis by attorneys capable of reading Chinese prior to production.

34.     After exchanging initial disclosures, Plaintiffs and TAL negotiated a Protective Order, which the Court entered on March 31, 2021, and an ESI Protocol, which the Court entered on April 12, 2021.

35.     TAL made its first substantive production of documents on or about April 14, 2021, producing approximately 5,570 pages of documents.  Plaintiffs reviewed and analyzed the documents TAL produced.  The vast majority of these documents were written in Chinese in whole or in part, and so required review and analysis by attorneys capable of reading Chinese.  The documents produced included filings with the PRC's State Administration for Industry and Commerce, filings with the PRC's National Enterprise Credit Information Publicity System, websites including those operated by TAL and its affiliates, and articles regarding TAL and its affiliates.  The documents produced also included internal TAL documents relating to leases, labor contracts, board resolutions, email correspondence, an investment contract, and tax payment information.

36.     Plaintiffs also propounded comprehensive Requests for Production of Documents and Interrogatories on TAL.  Conversely, TAL propounded Requests for Production of Documents and Interrogatories upon Plaintiffs.  Plaintiffs researched, drafted and served responses and objections to TAL's Requests for Production of Documents and Interrogatories.  Plaintiffs analyzed TAL's responses and objections to Plaintiffs' Requests for Production of Documents and Interrogatories, in preparation for addressing and resolving any disputes relating to the scope of TAL's discovery responses.

37.     Following entry of the ESI Protocol, Plaintiffs researched and drafted proposed search terms and custodians for the collection and production of electronically-stored information (or "ESI"), and engaged in substantial negotiations regarding these proposed terms and custodians with TAL.  These negotiations included TAL's production to Plaintiffs of search term hit count reports identifying the number of documents returned by particular search terms in English and in Chinese.

38.     Plaintiffs also began to identify, and conduct research relating to, third parties likely to have relevant documents, including TAL's affiliates, Muddy Waters, investors in TAL and its affiliates, analysts covering TAL, and TAL's auditor.  Plaintiffs created drafts of subpoenas for the production documents to serve upon such third parties, and were prepared to finalize and serve those subpoenas in the event that Plaintiffs and TAL did not promptly reach a settlement agreement.

39.     In sum, Plaintiffs devoted substantial efforts to fact discovery, thereby obtaining significant information from TAL, and demonstrating to TAL their readiness to diligently pursue discovery throughout the course of this action.

### G.   Preparation for Class Certification

40.   While fact discovery was ongoing, Plaintiffs began preparing their motion for class certification.   Plaintiffs conducted extensive research and substantially drafted their opening motion for class certification, which was due to be filed on April 30, 2021.   ECF No. 56.   Plaintiffs also worked closely with Dr. Adam Werner, an economic expert, who drafted a report on market efficiency for TAL ADS to be submitted in conjunction with the class certification motion.

41.   Plaintiffs and TAL entered into the proposed Settlement by accepting the mediator's proposal just prior to the deadline for filing Plaintiffs' motion for class certification (*see* ¶44, *infra*).   Accordingly, the motion for class certification was never filed.

### H.   Mediation Efforts, Settlement Negotiations, and the Settlement's Preliminary Approval

42.   While the Parties were engaged in fact discovery and preparing for class certification, they agreed to explore the possibility of settlement and selected Jed Melnick, Esq. to serve as the mediator.

43.   In advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a persuasive, evidence-based mediation statement setting forth the facts relevant to the underlying alleged misrepresentations, and analyzing applicable facts and law.   The Parties then exchanged mediation statements.

44.   On March 4, 2021, Lead Counsel and Defendant's Counsel participated in a full-day mediation session with Mr. Melnick.   During the mediation session, the Parties engaged in full and frank discussions concerning the merits of this Action, including, for example, the facts alleged to support Plaintiffs' claims.   This negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses.   Although the Parties did not reach an agreement to settle the case, Mr. Melnick continued discussions with the Parties

over the course of several weeks.  Ultimately, Mr. Melnick made a mediator's proposal that the Parties settle the matter for $7,500,000 in cash.

45.     On April 23, 2021—one week before the class certification deadline—the Parties accepted the mediator's proposal, agreeing to settle the action for $7,500,000, subject to the execution of a customary long-form stipulation and agreement of settlement and related papers. On April 26, 2021, the Parties informed the Court of the proposed Settlement and asked the Court to suspend all case deadlines while they negotiated a long-form Settlement agreement.  ECF No. 68.

46.     Following additional negotiations, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation dated June 24, 2021.  The following day, Plaintiffs submitted their Unopposed Motion for: (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Class; and (III) Approval of Notice of the Settlement.  ECF Nos. 72-75.

47.     On July 2, 2021, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice.  ECF No. 77.

## III.     THE RISKS OF CONTINUED LITIGATION

48.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $7,500,000.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

### A.     Risks Faced in Obtaining and Maintaining Class Action Status

49.     Defendant likely would have argued against class certification.  While Lead Counsel researched and analyzed class certification and are confident that all of the Rule 23

requirements would have been met, and the Court would have certified the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendant would have undoubtedly raised arguments challenging the propriety of class certification.  Moreover, even if Plaintiffs successfully obtained class certification, Defendant could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.  Class certification was, by no means, a forgone conclusion.

50.    Additionally, a recent ruling by the United States Supreme Court has made obtaining class certification for Plaintiffs more difficult and could potentially provide additional challenges should the litigation against Defendant proceed.  In *Goldman Sachs Grp. v. AR Teacher Ret.*, 141 S.Ct. 1951 (June 21, 2021), the Supreme Court held, in part, that when defendants are seeking to rebut the presumption of reliance established under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as modified by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), courts may consider the generic nature of an alleged misrepresentation as evidence of lack of price impact.  Accordingly, courts are now permitted to assess materiality of an alleged misstatement and consider "all evidence relevant to price impact" at the class certification stage.  On the plus side for Plaintiffs, the Supreme Court did clarify that defendants bear the burden of persuasion of showing a lack of price impact by a preponderance of the evidence.

### B.    Challenges to Obtaining Discovery

51.    Plaintiffs would have needed to surmount significant obstacles to obtain evidence required to support their claims.  Relevant evidence in this matter was predominately located in the PRC and written in Chinese.  Document discovery would have been hampered—if not prevented altogether in at least certain instances—by the PRC's state secrecy and data privacy

laws, which limit the type of information that can be exported out of the country.  As a result, Plaintiffs' Counsel may have been restricted or forbidden from reviewing certain documents, and there is no guarantee they would have been able to conduct the document discovery necessary to prove their case.

52.     Even if Defendant produced documents, many of those documents may have supported Defendant's narrative of the case and undermined Plaintiffs' case.  For example, TAL would continue to argue that it did *not* retain control over the GZ1-1 business, based in part, on GZ1-1's employees purportedly either signing new contracts with the purchasing entity or terminating their employment after the transaction was executed.  TAL would also continue to argue its sale and repurchase of GZ 1-1, approximately one year later, was the result of the buyer's changing economic circumstances, was not a sham transaction and, as a result, was properly accounted for by TAL.

53.     Moreover, the vast majority of relevant documents would be in the Chinese language, requiring the costly translation of every single significant piece of evidence.  Not only is translation expensive, but sometimes its accuracy is questionable, as often a word or phrase can have multiple meanings or a different meaning depending on context.

54.     In addition, in virtually all cases, deposition discovery is not allowed in the PRC, so Plaintiffs would have been required to examine witnesses in another jurisdiction, such as Hong Kong, where depositions are typically taken.[5]  However, China—during the pendency of the Action—asserted increased authority over Hong Kong, resulting in unrest and travel restrictions.

---

[5] The U.S. Department of State currently advises its citizens that "China does **not** permit attorneys to take depositions in China for use in foreign courts."  *Available at* https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/China.html. (emphasis in original).

It would have been unlikely that Plaintiffs' or Defendant's Counsel could have traveled to Hong Kong for any depositions. Thus, even *if* Plaintiffs could successfully locate and compel testimony from fact witnesses or Individual Defendants (highly unlikely given they were not successfully served), it is unclear where those depositions would take place.

55. The ability to take depositions would have been further complicated by the COVID-19 pandemic. Plaintiffs would have likely been required to depose TAL's witnesses over multi-day videoconferences (although if the witnesses could not travel to Hong Kong, it is unclear where they would or could sit for a video deposition) through interpreters and expensive and cumbersome translation of documents produced in Chinese, if such discovery would have been obtainable at all under Chinese regulations.

### C.        Risks to Proving Liability

56. In addition to the hurdles of obtaining foreign discovery and class action status, Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendant's liability. Defendant forcefully argued in its motion to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Plaintiffs could not establish the elements of their Exchange Act claims.

57. For instance, Defendant strenuously argued, and would continue to argue, among other things: (1) TAL's sale and subsequent re-purchase of the GZ1-1 business was a not sham transaction as Plaintiffs alleged; (2) in light of the non-fraudulent nature of the GZ1-1 transaction, TAL did not improperly recognize $50 million in pre-tax income; (3) TAL did not acquire a majority interest in Shunshun in December 2015; (4) in light of TAL's non-majority interest in Shunshun, TAL did not improperly recognize a $25.2 million accounting profit.

58.     While both this Court and the Second Circuit acknowledged that TAL had proffered non-fraudulent business reasons that would account for the alleged conduct, they reached different conclusions as to the import of those reasons at the pleading stage.  While Plaintiffs sufficiently alleged and believed they were building a strong circumstantial case, there was no guarantee that documents and deposition testimony obtained during fact discovery would support their narrative of the case.  Additionally, if Plaintiffs advanced past summary judgment and proceeded to trial, substantial uncertainty remains as to how a trier of fact would view each side's narrative of the events at issue.

59.     Though the Court did not evaluate whether Plaintiffs sufficiently plead a strong inference of scienter in its motion to dismiss order, Defendant would likely further argue that Plaintiffs could not establish the element of scienter.  Plaintiffs did not allege TAL's senior management possessed any motive and opportunity to commit securities fraud, and Defendant would likely argue that evidence would demonstrate an inference of good faith, contrary to Plaintiffs' assertions.

**D.     Risks to Proving Loss Causation and Damages**

60.     Assuming Plaintiffs overcame the above risks and established Defendant's liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.  While Plaintiffs would have argued that the declines in the price of TAL ADS were attributable to corrections of the alleged misstatements and omissions that occurred on June 13, 2018, Defendant would have asserted that much of the decline was due to other negative news, and that even if some portion of the decline in price of TAL ADS was caused by the corrective disclosure, damages were minimal.  As TAL argued in its motion to dismiss, "the purported corrective disclosure—a report by short-seller Muddy Waters, LLC—expressly discloses that 'all

information contained herein . . . ***has been obtained from public sources*** . . . and who are ***not*** insiders or connected persons.'"  In short, TAL argued, and likely would have continued to argue, that there was no sufficiently *new* non-public news in the Muddy Waters Report to establish loss causation.  Separately, Defendant likely would have tried to develop evidence to contradict and/or discredit the facts stated in the Muddy Waters Report, further putting at risk Plaintiffs' ability to prove loss causation if TAL were able to convince a jury that the Muddy Waters Report did not reveal any concealed or misrepresented *truth* about TAL.

61.     Moreover, in order to prove their claims, Plaintiffs would have to proffer expert testimony demonstrating, among other things: (a) what the "true value" of TAL ADS would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of TAL ADS was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the disclosure on June 13, 2018.  Such expert testimony is expensive, time consuming, and subject to rebuttal.

62.     Indeed, Defendant almost certainly would have presented its own damages expert(s), who would have no doubt presented conflicting conclusions and theories for TAL ADS price declines on the alleged disclosure date.  Defendant likely would have challenged Plaintiffs' expert(s) at the class certification stage, summary judgment, with *Daubert* motions, and at trial and appeal.  This "battle of the experts" creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of Defendant's competing experts.

### E.     Other Risks, Including Trial, Appeals, and Ability To Collect a Judgment

63.     Plaintiffs would have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one.  Lead Counsel

know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.  In fact, GPM recently lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).  Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

64.     Even if Plaintiffs succeeded in proving all elements of their case at trial and obtained a jury verdict, TAL would almost certainly have appealed.  An appeal not only would have renewed the risks faced by Plaintiffs—as TAL would have reasserted its arguments summarized above—but also would have resulted in significant additional delay and further depletion of TAL's already wasting insurance policies.  Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

65.     Moreover, *if* Plaintiffs successfully won the appeal, collecting a judgment from a Chinese company is incredibly difficult, if not impossible.  China is not a signatory to any international convention on recognition and enforcement of a foreign court judgement.  Moreover, there is no bilateral treaty or multilateral convention in force between the United States and China on reciprocal recognition and enforcement of court judgments.[6]

66.     Additionally, the Chinese government has recently implemented measures that threaten to put private education companies like TAL out of business, potentially leaving the

---

[6] *Available at* https://blogs.law.nyu.edu/transnational/2018/04/the-chinese-courts-enforcement-of-a-u-s-civil-judgement/.

Settlement Class with nothing after years of hard-fought litigation.  On July 23, 2021, Bloomberg reported that the Chinese government was circulating legislation that, among other things, formally prohibited any foreign ownership of educational businesses such as TAL.  Zheping Huang et al, *China Considers Turning Tutoring Companies Into Non-Profits*, July 23, 2021.[7]  The new regulations also imposed such severe restrictions on TAL's business operations, such as prohibiting weekend tutoring, that commentators referred to the regulations as turning TAL into a non-profit.  *Id.*  On July 24, 2021, the Chinese government formally promulgated these regulations. *China Focus: China issues guidelines to ease burden of young students*, July 24 (no authors credited).[8]  With these measures in place, there is a substantial risk that TAL would not survive the many years it would take for this case to wind its way through trials and appeals.

### F.   The Settlement is Reasonable in Light of Potential Recovery in the Action

67.    In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  If Plaintiffs had fully prevailed in each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory, including proof of loss causation as to the ADS price drop date alleged in this case—*i.e.*, Plaintiffs' best-case scenario—estimated total ***maximum*** damages are approximately $141 million.  Under this scenario, the Settlement represents a recovery of 5.3% of the Settlement Class's maximum estimated damages.  In comparison, the median recovery in securities class actions in 2020 was approximately 1.7% of estimated damages.  See Ex. 7 (Janeen

---

[7]   Available   at:   https://www.bloomberg.com/news/articles/2021-07-23/china-is-said-to-mull-turning-tutoring-firms-into-non-profits.

[8] Available at: http://www.xinhuanet.com/english/2021/07/24/c_1310083396.htm.

McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021 at p. 20 (Fig. 16)).

68.     However, if Defendant prevailed on its disaggregation argument detailed above, damages could have been significantly lower, or eliminated entirely.

## IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

69.     The Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Proof of Claim and Release Form (the "Claim Form" and, collectively with the Notice, the "Notice Packet") be disseminated to the Settlement Class.  The Preliminary Approval Order also set a deadline of November 9, 2021 (21 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the application for attorneys' fees and Litigation Expenses or to request exclusion from the Settlement Class, and set a final fairness hearing date of November 30, 2021 (the "Settlement Hearing").

70.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, the Court-approved Claims Administrator, to begin disseminating copies of the Notice Packet and publish the Summary Notice.  Contemporaneously with the mailing of the Notice Packet, Lead Counsel instructed A.B. Data to post downloadable copies of the Notice and Claim Form online at www.TalEducationSecuritiesLitigation.com (the "Settlement Website").  The Notice directed Settlement Class Members to the Settlement Website to obtain additional information on the Settlement, including how to file a claim and access to downloadable versions of the Notice Packet.

71.     The Court-approved Notice disclosed, among other things, the following information to Settlement Class Members: (a) the $7.5 million Settlement Amount; (b) the

proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees on behalf of all Plaintiffs' Counsel in an amount not to exceed 33⅓% of the Settlement Fund (*i.e.*, the Settlement Amount, plus interest), and Litigation Expenses in an amount not to exceed $230,000, which could include an application for reimbursement to Plaintiffs for their costs and expenses; (d) that any Settlement Class Member could object to the requested attorneys' fees and Litigation Expenses; (e) a detailed explanation of the reasons for the Settlement; (f) that requests for exclusion from the Settlement must be filed no later than November 9, 2021; (g) that objections to the Settlement, the Plan of Allocation, and/or the fee and expense application must be filed no later than November 9, 2021; and (h) that the deadline for filing Proof of Claims is November 30, 2021.

72.     To disseminate Notice Packets, A.B. Data obtained from Defendant's Counsel, the names and addresses of record holders of TAL ADS that are potential Settlement Class Members (the "TAL Record Holder List").  In addition, A.B. Data maintains a proprietary database with names and addresses of the largest and most common banks, brokers, and other nominees (the "Record Holder Mailing Database").  On August 2, 2021, A.B. Data caused the Notice Packet to be sent by First-Class Mail to 4,992 mailing records contained in the Record Holder Mailing Database and the TAL Record Holder List.  *See* Declaration of Erica Shelton Regarding: (A) Mailing of Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Shelton Decl."), attached hereto as Exhibit 3 at ¶¶5-7.

73.     As of October 19, 2021, A.B. Data caused a total of 67,758 copies of the Notice Packet to be sent to potential Settlement Class Members.  *See id.* at ¶10.[9]

---

[9] A.B. Data re-mailed 711 Notice Packets to persons whose original mailings were returned by the U.S. Postal Service and for whom updated addresses were either provided to A.B. Data by the Postal Service or ascertained through third-party information provider.  *Id.*

74. On August 16, 2021, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published once in *Investor's Business Daily* and transmitted over the *PR Newswire*. *See id.* at ¶11.

75. Lead Counsel also caused A.B. Data to establish the dedicated Settlement Website, which became operational on August 2, 2021, to provide potential Settlement Class Members with information concerning the Settlement, submit a claim online, and download copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, Complaint, and other important documents filed with the Court. *Id.* at ¶13.

76. Beginning on August 2, 2021, a case-specific toll-free telephone number, (877) 777-9316, was established with an interactive voice response system and live operators. The automated attendant answers the calls and presents callers with a series of choices to respond to basic questions. Callers requiring further help have the option to be transferred to a live operator during business hours. *Id.* at ¶12.

77. As set forth above, the Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Class, is November 9, 2021. To date, only two (2) requests for exclusion has been received. *See* Ex. 3-D. A.B. Data will file a supplemental affidavit after the November 9, 2021 deadline addressing whether any additional requests for exclusion have been received. In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the application for attorneys' fees and Litigation Expenses have been entered on this Court's docket or have otherwise been received by Lead Counsel. Lead Counsel will file reply papers by November 23, 2021 that will address any objections that may be received.

24

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

78.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $7,500,000 Settlement Amount, plus any and all interest earned thereon, less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information either online or postmarked no later than November 30, 2021.  The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to Court approval.  *See* Ex. 3-A (Notice) at ¶57; ECF No. 74-1 (Stipulation at ¶20).  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

79.     The proposed Plan of Allocation is detailed in the Notice.  *See* Ex. 3-A (Notice, pp. 9-13).  The Notice was sent to Settlement Class Members, and a downloadable version is posted online at www.TalEducationSecuritiesLitigation.com.  If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants.  The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged wrongdoing as opposed to losses caused by market or industry-wide factors or Company-specific factors unrelated to the alleged wrongdoing and takes into consideration when each Authorized Claimant purchased and/or sold TAL ADS.  *See id*.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the Plan of

Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶49.

80.     The Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action.  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of TAL ADS was artificially inflated during the period from June 1, 2016 through and including June 13, 2018 due to Defendants' alleged materially false and misleading statements and omissions.  The Plan of Allocation is based on the premise that the decrease in the price of TAL ADS following the alleged corrective disclosure on June 13, 2018 at approximately 10:47 a.m. may be used to measure the alleged artificial inflation in the price of TAL ADS prior to this disclosure.  *See id.* at ¶51.

81.     Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  *Id.* at ¶57.

82.     An individual Claimant's recovery under the Plan of Allocation will depend on several factors, including the number of valid claims filed by other Claimants and how many shares of TAL ADS the Claimant purchased, acquired, or sold during the Settlement Class Period and when that Claimant bought, acquired, or sold the shares.  If a Claimant has an overall market gain with respect to his, her, or its overall transactions in TAL ADS during the Settlement Class Period, or if the Claimant purchased shares during the Settlement Class Period, but did not hold any of

those shares through the alleged corrective disclosure, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud. *Id.* at ¶51.

83.     If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant. *Id.* at ¶54. Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater. In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost-prohibitive.[10]

84.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in TAL ADS that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

85.     As noted above, as of October 19, 2021, a total of 67,758 copies of the Notice Packet had been disseminated to potential Settlement Class Members, which provides the Plan of Allocation therein, directs Settlement Class Members to the Settlement Website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation. *See* Shelton Decl. at ¶16; Ex. 3-A (Notice). To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

---

[10] If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective. Ex. 3-A (Notice) at ¶63. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Lead Counsel and approved by the Court.

## VI.   LEAD   COUNSEL'S   REQUEST   FOR   ATTORNEYS'   FEES   AND REIMBURSEMENT OF LITIGATION EXPENSES

86.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 33⅓% of the Settlement Fund (or $2,500,000, plus interest earned at the same rate as the Settlement Fund).   Lead Counsel also request reimbursement of Litigation Expenses in the amount of $174,013.14, which includes $159,013.14 in out-of-pocket expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund, and a total of $15,000 to Plaintiffs ($7,500 each) for their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class.  The total Litigation Expenses amount of $174,013.14 is well below the maximum expense amount of $230,000 set forth in the Notice.   The legal authorities supporting a 33⅓% fee award are set forth in the accompanying Fee Memorandum, which is being filed contemporaneously herewith.   The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.     The Fee Application

87.     Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class.  As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery.  The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances.  This paradigm minimizes unnecessary drain on the Court's resources.  Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.  Furthermore, as set forth below, though not required in the Second Circuit,

Lead Counsel also respectfully submits that the requested fee is fully supported by a "lodestar multiplier cross-check."

88.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved.  As discussed in the Fee Memorandum, a 33⅓% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

        **1.     The Excellent Outcome Achieved is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action**

89.     Attached hereto as Exhibits 4 , 5, and 6 are declarations from Plaintiffs' Counsel in support of an award of attorneys' fees and reimbursement of Litigation Expenses.  Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm from the inception of the case through October 20, 2021, a summary of expenses by category, and a firm resume.[11]  The following is a chart of lodestar amounts for Plaintiffs' Counsel:

| LAW FIRM: | LODESTAR |
|---|---|
| Glancy Prongay & Murray LLP | $1,448,341.00 |
| The Rosen Law Firm, P.A. | $468,102.00 |
| Schall Law Firm | $4,800.00 |
| **TOTAL LODESTAR** | **$1,921,243.00** |

90.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District. Additionally, the rates billed by Plaintiffs' Counsel attorneys (ranging from $500-750 per hour for non-partners and $600-995 per hour for partners) are comparable to peer plaintiff and defense

---

[11] Time expended in preparing the application for fees and reimbursement of Litigation Expenses has not been included.

firms litigating matters of similar magnitude.  *See* Ex. 10 attached hereto (table of peer law firm billing rates).

91.     As set forth above and in detail in Exhibits 4, 5, and 6, Plaintiffs' Counsel have collectively expended a total of 2,836.90 hours in the investigation and prosecution of the Action through and including October 20, 2021.  The resulting total lodestar is $1,921,243.00.  The requested fee amount of 33⅓% of the Settlement Fund equals $2,500,000.00 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 1.3 multiplier of Plaintiffs' Counsel's lodestar, and is not only reasonable, but is modest when viewing the range of fee multipliers typically awarded in comparable securities class action and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

92.     Moreover, in addition to drafting the motion for final approval, Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process.  No additional compensation will be sought for this work.

93.     As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.  Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case.  I personally devoted substantial time to this case and oversaw and/or was personally involved in drafting or reviewing and editing all pleadings, court filings, various discovery-related materials, meditation statements, and other correspondence prepared on behalf of Plaintiffs, communicating with Plaintiffs on a regular basis, engaging with Defendant's counsel on a variety of matters, and was intimately involved in

Settlement negotiations.  Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various discovery-related materials, and the mediation submissions, communicated with Plaintiffs, the mediation process, negotiating the terms of the Stipulation, and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

94.     Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2.      The Magnitude and Complexity of the Action

95.     As detailed in the Fee Memorandum, securities class action cases are known for their notorious complexity.  This case was no different.  As detailed above, this Action presented numerous novel and complex issues, including the need for Plaintiffs' Counsel to understand, among other things: Chinese administrative law and regulatory processes; the workings of the Chinese political and legal system; accounting treatment of certain financial transaction in both the United States and the PRC; and issues concerning the sale and repurchase of GZ1-1 and TAL's investment in Shunshun.

96.     The Action has been particularly high-stakes, and has proven to be a highly contentious, hard-fought, lengthy, expensive, international litigation.

97.     For example, Plaintiffs' investigation was assisted by investigators in Asia, who had to locate TAL former employees and provide investigative memos translated from interviews

conducted in Chinese. Moreover, articles discussing TAL and documents produced by TAL also had to be translated from Chinese, which at times was highly cumbersome, as occasionally phrases were subject to varying interpretations.

98.     Moreover, this Action involved complex damages issues, as TAL raised in its motion to dismiss and during mediation, which required Plaintiffs to extensively consult with their damages experts throughout the litigation.

99.     Finally, the mediation process in this Action was long and hard-fought. Both Parties zealously advocated their positions for several weeks before Mr. Melnick made, and the Parties accepted, the mediator's proposal.

### 3.     The Significant Risks Borne by Plaintiffs' Counsel

100.     This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis. From the outset, this Action was an especially difficult and highly uncertain securities case. There was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and incurred $159,013.14 in out-of-pocket litigation-related expenses in prosecuting the Action.

101.     Additionally, Plaintiffs and Plaintiffs' Counsel developed and then alleged the Exchange Act claims without information gained through subpoena power, hindered by the

PSLRA's automatic discovery stay.

102.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured.  Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement.  *See supra*, ¶63.  On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

### 4.    The Quality of Representation, Including the Result Obtained, The Experience and Expertise of Plaintiffs' Counsel, and the Standing and Caliber of Defendants' Counsel

103.    As demonstrated by the firm resumes, attached hereto as Exhibits 4, 5, and 6, Plaintiffs' Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation.  Indeed, Lead Counsel and RLF have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country.  Lead Counsel and RLF enjoy well-deserved reputations for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters.  I believe Plaintiffs' Counsel's experience added valuable leverage in the settlement negotiations.

104.    Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendant was represented by Skadden, Arps, Slate, Meagher & Flom LLP, a well-known international law firm that vigorously represented the interests of its client throughout this Action.  In the face of this experienced and formidable opposition, Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendant to settle the case on terms that were highly favorable to the Settlement Class.

### 5.       The Requested Fee in Relation to the Settlement

105.     The amount of the fee requested (33⅓%) in relation to the Settlement Amount ($7.5

million) is fair and reasonable.  Courts routinely award fees of 33⅓% in securities class action

settlements.  *See* Fee Memorandum § III.C.1.

### 6.       Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

106.     Courts consistently recognize that it is in the public interest to have experienced

and able counsel to enforce the securities laws and regulations pertaining to the duties of officers

and directors of public companies.  As recognized by Congress through the passage of the PSLRA,

vigorous private enforcement of the federal securities laws can only occur if private investors,

particularly large investors, take an active role in protecting the interests of shareholders.  If this

important public policy is to be carried out, the courts should award fees that adequately

compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a particular

securities class action.  Relatedly, it is long-recognized public policy that settlement is to be

encouraged, including the resolution of fee applications that fairly and adequately compensate the

counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to

achieve those settlements.

### 7.       The Reaction of the Settlement Class Supports Lead Counsel's Fee Request

107.     As noted above, as of October 19, 2021, a total of 67,758 Notice Packets were

mailed advising Settlement Class Members that Lead Counsel would apply for an award of

attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund.  Shelton Decl. ¶10; Ex.

3-A (Notice).  In addition, the Court-approved Summary Notice has been published in *Investor's*

*Business Daily* and transmitted over the *PR Newswire*.  Shelton Decl. at ¶11; Exs. 3-B and 3-C

(confirmations of Summary Notice publication).  To date, no objection to the maximum potential

attorneys' fees request set forth in the Notice has been received or entered on this Court's docket. Any objection received after the date of this filing will be addressed in Lead Counsel's reply papers, which are to be filed by November 23, 2021.

### 8. Lead Plaintiffs Support Lead Counsel's Fee Request

108.    As set forth in the declarations submitted by Lead Plaintiffs Edward Lea and Dios Asset Management, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 1 ("Lea Decl.") ¶¶9-11; Ex. 2 ("Dios Decl.") ¶¶9-11.  Mr. Lea and Dios Asset Management have been intimately involved in this case, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

109.    In sum, Plaintiffs' Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted the Action without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33⅓%, resulting in a modest multiplier of 1.3, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable

110.    Lead Counsel seeks a total of $174,013.14 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes: $159,013.14 in out-of-pocket expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $15,000 ($7,500 each) to Mr. Lea and Dios Asset Management, pursuant to 15 U.S.C. § 78u-4(a)(4) for their reasonable costs

(including lost wages) directly incurred in connection with their representation of the Settlement Class.  *See* Lea Decl., ¶12; Dios Decl., ¶12.

111.   Lead Counsel is seeking reimbursement of a total of $159,013.14 in out-of-pocket costs and expenses.  The following is a combined breakdown by category of all expenses incurred by Plaintiffs' Counsel:

| ITEM | AMOUNT |
|---|---|
| COURIER AND SPECIAL POSTAGE | $231.81 |
| COURT FILING FEES | $2,082.35 |
| DOCUMENT MANAGEMENT | $2,312.50 |
| EXPERTS | $95,395.00 |
| INVESTIGATIONS | $18,973.43 |
| MEALS | $45.20 |
| MEDIATORS | $14,407.18 |
| ONLINE RESEARCH | $14,041.58 |
| PHOTOIMAGING | $7,169.22 |
| PRESS RELEASES | $2,275.00 |
| RESEARCH OTHER | $596.75 |
| SERVICE OF PROCESS | $249.70 |
| TRANSLATION FEES | $1,233.42 |
| GRAND TOTAL | $159,013.14 |

112.   The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $230,000.  The total amount requested by Lead Counsel and Plaintiffs, $174,013.14, falls well below the $230,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

113.   From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover their out-of-pocket expenses.  Plaintiffs' Counsel also understood that, even assuming the

case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action.  Accordingly, Plaintiffs' Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

114.    The largest component of expenses, $95,395.00, or approximately 60% of the total expenses, was expended on the retention of experts—one in the field of accounting; and two in the field of damages and loss causation.  These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint and a report on market efficiency in anticipation of Plaintiffs' motion for class certification, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

115.    Another large component of expenses, $18,973.43, or approximately 12% of the total expenses, was expended on the retention of private investigators, who conducted numerous fact interviews with former TAL employees and other relevant third parties in connection with Lead Counsel's investigation.

116.    Additionally, Lead Counsel paid $14,407.18 in mediation fees owed to Mr. Melnick for the services Mr. Melnick provided during the settlement negotiation period, which is approximately 9% of the total expenses incurred.

117.    The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things, court fees, translation costs, service of process costs, cost of publishing press releases as required by the PSLRA, photoimaging, postage and delivery expenses, and the cost of on-line legal research.

118.   Finally, as stated above, Plaintiffs seek reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class, in the amount of $7,500 each.  *See* Lea Decl., ¶¶12-13; Dios Decl., ¶¶12-13.  Mr. Lea and Dios Asset Management worked closely with Lead Counsel throughout the pendency of this Action in connection with their service as Lead Plaintiffs.  For example, Mr. Lea and Dios Asset Management: (a) regularly communicated with Lead Counsel regarding the posture and progress of the case, as well as the litigation strategy; (b) reviewed all significant pleadings and briefs filed in the Action; (c) reviewed Court orders and discussed them with Lead Counsel; (d) produced documents in response to Defendant's requests for production and responded to Defendant's interrogatories; (e) discussed mediation strategy with Lead Counsel; (f) evaluated the Settlement Amount, conferred with Lead Counsel, and ultimately approved the Settlement; and (g) communicated with Lead Counsel regarding finalizing the Settlement.  *See* Lea Decl., ¶¶3-5; Dios Decl., ¶¶3-5.

119.   To date, no objections to the Litigation Expenses has been filed on the Court's docket.  In my opinion, the Litigation Expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

120.   In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable.  I further submit that

the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $174,013.14 in Litigation Expenses, including PSLRA reimbursement for costs in the amounts of $7,500 each for Lead Plaintiff Edward Lea and Dios Asset Management, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 26th day of October, 2021, at Los Angeles, California.

_s/ Kara M. Wolke_
KARA M. WOLKE

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 26, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 26, 2021.


*s/ Kara M. Wolke*
Kara M. Wolke